**ORAL ARGUMENT NOT YET SCHEDULED**

No. 10-1425 (and consolidated cases)

———————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

STATE OF TEXAS et al.,

Petitioners,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY et al.,

Respondents.

———————————

ON PETITION FOR REVIEW OF FINAL AGENCY ACTIONS OF THE
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

———————————

**PETITIONERS' OPENING BRIEF**

———————————

JOHN A. RILEY
CHRISTOPHER C. THIELE
Bracewell & Giuliani LLP
111 Congress Avenue, Suite 2300
Austin, Texas 78701-4061
Telephone: (512) 542-2108
Facsimile: (800) 404-3970
E-mail: john.riley@bgllp.com
*Counsel for Chase Power Development, LLC*

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

J. REED CLAY, JR.
Special Assistant and Senior Counsel to
the Attorney General

Additional counsel listed on following
pages.

F. WILLIAM BROWNELL
HENRY V. NICKEL
NORMAN W. FICHTHORN
ALLISON D. WOOD
Hunton & Williams LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037-1701
Telephone: (202) 955-1500
Facsimile: (202) 778-2201
E-mail: bbrownell@hunton.com
*Counsel for the Utility Air Regulatory Group*

DAVID B. RIVKIN, JR.
MARK W. DELAQUIL
ANDREW M. GROSSMAN
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5304
Telephone: (202) 861-1500
Facsimile: (202) 861-1783
E-mail: drivkin@bakerlaw.com
*Counsel to the State of Texas*

CHARLES H. KNAUSS
SHANNON S. BROOME
Katten Muchin Rosenman LLP
2900 K Street, NW, North, Suite 200
Washington, DC  20007
Telephone: (202) 625-3500
Facsimile:  (202) 295-1125
E-mail: shannon.broome@kattenlaw.com
*Counsel for Petitioners SIP/FIP Advocacy
Group, Texas Association of Business, Texas
Association of Manufacturers and Texas
Chemical Council*

MATTHEW G. PAULSON
Baker Botts LLP
98 San Jacinto Boulevard
1500 San Jacinto Center
Austin, TX  78701
Telephone: (512) 322-2500
Facsimile: (512) 322-8329
E-mail:
matthew.paulson@bakerbotts.com
*Counsel for Petitioners SIP/FIP Advocacy
Group, Texas Association of Business, Texas
Association of Manufacturers and Texas
Chemical Council*

ROGER R. MARTELLA, JR.
Sidley Austin LLP
1501 K Street, NW
Washington, DC  20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711
E-mail: rmartella@sidley.com
*Counsel for Petitioners SIP/FIP Advocacy*
*Group, Texas Association of Business, Texas*
*Association of Manufacturers and Texas*
*Chemical Council*

## CERTIFICATE AS TO PARTIES, RULINGS
## AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Petitioners state as follows:

**A.**    **Parties, Intervenors, and Amici:**

**<u>Petitioners:</u>**

The State of Texas

Rick Perry, Governor of Texas

Greg Abbott, Attorney General of Texas

Texas Commission on Environmental Quality

Texas Department of Agriculture

The Railroad Commission of Texas

Texas General Land Office

Barry Smitherman, Chairman, the Railroad Commission of Texas

Donna Nelson, Chairman, Public Utility Commission of Texas

Kenneth Anderson, Commissioner, Public Utility Commission of Texas

Utility Air Regulatory Group

Chase Power Development, LLC

SIP/FIP Advocacy Group

Texas Chemical Council

Texas Association of Business

Texas Association of Manufacturers

**Intervenor for Petitioners:**

None

**Respondent:**

United States Environmental Protection Agency ("EPA")

Lisa Perez Jackson, Administrator, EPA

**Intervenors for Respondent:**

Conservation Law Foundation

Environmental Defense Fund

Natural Resources Defense Council

Sierra Club

**Amici Curiae:**

American Chemistry Council

American Petroleum Institute

National Association of Manufacturers

National Oilseed Processors Association

American Fuel & Petrochemical Manufacturers

**Prior Amici Curiae**

National Fuel & Petrochemical Manufacturers (terminated Jan. 31, 2012)

Each of these consolidated cases is a petition for review of agency action; there were no proceedings before the District Court, and therefore the requirement to

furnish a list of all parties and amici who appeared before the District Court is inapplicable.

## B.    Rulings Under Review

The rulings under review are final actions promulgated by the EPA entitled the *Determinations Concerning Need for Error Correction, Partial Approval and Partial Disapproval, and Federal Implementation Plan Regarding Texas Prevention of Significant Deterioration Program*, 75 Fed. Reg. 82,430 (Dec. 30, 2010), and the *Determinations Concerning Need for Error Correction, Partial Approval and Partial Disapproval, and Federal Implementation Plan Regarding Texas's Prevention of Significant Deterioration Program*, 76 Fed. Reg. 25,178 (May 3, 2011).

## C.    Related Cases

To the knowledge of undersigned counsel, there are no other cases related to this case other than the following consolidated cases:

*Chase Power Development, LLC v. U.S. Environmental Protection Agency et al.*, No. 11-1062

*State of Texas et al. v. U.S. Environmental Protection Agency*, No. 11-1128

*Utility Air Regulatory Group v. U.S. Environmental Protection Agency*, No. 11-1247

*Chase Power Development, LLC v. U.S. Environmental Protection Agency et al.*, No. 11-1249

*The SIP/FIP Advocacy Group et al. v. U.S. Environmental Protection Agency*, No. 11-1250

# DISCLOSURE STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, the following Petitioners and Amici provide the following disclosures:

**The Utility Air Regulatory Group** ("UARG") is a not-for-profit association of individual electric generating companies and national trade associations that participates on behalf of its members collectively in administrative proceedings under the Clean Air Act, and in litigation arising from those proceedings, that affect electric generators. UARG has no outstanding shares or debt securities in the hands of the public and has no parent company. No publicly held company has a 10% or greater ownership interest in UARG.

**The SIP/FIP Advocacy Group** has no parent companies, and no publicly held company has a 10% or greater ownership interest. It is composed of a group of trade associations whose member companies represent a cross-section of American industry, and who operate facilities in the State of Texas and are therefore affected by the SIP program at issue in this case. None of the members of the SIP/FIP Advocacy Group have issued shares or debt securities to the public. The members of the SIP/FIP Advocacy Group are "trade associations" within the meaning of Circuit Rule 26.1.

**The Texas Chemical Council** has no parent companies, and no publicly-held company has a 10% or greater ownership interest. It is a trade association with member companies representing the chemical industry operating in Texas. The Texas Chemical Council has not issued shares or debt securities to the public. The Texas Chemical Council is a "trade association" within the meaning of Circuit Rule 26.1.

**The Texas Association of Business** has no parent companies, and no publicly-held company has a 10% or greater ownership interest. It is a trade association with member companies representing a cross-section of Texas industry. The Texas Association of Business has not issued shares or debt securities to the public. The Texas Association of Business is a "trade association" within the meaning of Circuit Rule 26.1.

**The Texas Association of Manufacturers** has no parent companies, and no publicly-held company has a 10% or greater ownership interest. It is a trade association with member companies representing a cross-section of Texas manufacturing companies and facilities. The Texas Association of Manufacturers has not issued shares or debt securities to the public. The Texas Association of Manufacturers is a "trade association" within the meaning of Circuit Rule 26.1.

***The National Association of Manufacturers*** ("NAM") states that it is the nation's largest industrial trade association, representing small and large manufacturers in every industrial sector and in all 50 states. NAM's mission is to enhance the competitiveness of manufacturers by shaping a legislative and regulatory environment conducive to U.S. economic growth and to increase understanding among policymakers, the media and the general public about the vital role of manufacturing to America's economic future and living standards. NAM has no parent company, and no publicly held company has a 10% or greater ownership interest in NAM.

***The American Chemistry Council*** ("ACC") states that it is a nonprofit trade association whose member companies represent the majority of the productive capacity of basic industrial chemicals within the United States. ACC represents its members companies' interests in legislative, administrative, and judicial proceedings involving issues that impact the business of chemistry. ACC's members are regulated under the Clean Air Act. ACC has no parent company, and no publicly held company has a 10% or greater ownership interest in ACC.

***The American Petroleum Institute*** ("API") states that it is a national trade association representing all aspects of America's oil and natural gas industry. API has approximately 400 members, from the largest major oil company to the smallest of independents, from all segments of the industry, including producers, refiners, suppliers, pipeline operators and marine transporters, as well as service and supply companies that support all segments of industry. API has no parent company, and no publicly held company has a 10% or greater ownership interest in API.

***The National Oilseed Processors Association*** ("NOPA") states that it is a national trade association that represents 15 companies engaged in the production of vegetable meals and oils from oilseeds, including soybeans. NOPA's member companies process more than 1.7 billion bushels of oilseeds annually at 64 plants located throughout the country, including 59 plants that process soybeans. NOPA has no parent company, and no publicly held company has a 10% or greater ownership interest in NOPA.

***The American Fuel & Petrochemical Manufacturers*** ("AFPM"), f/k/a National Petrochemical & Refiners Association, states that it is a national trade association whose members comprise more than 400 companies, including virtually all United States refiners and petrochemical manufacturers. AFPM's members supply consumers with a wide variety of products and services that are used daily in homes and businesses. These products include gasoline, diesel fuel, home-heating oil, jet fuel, asphalt products and the chemicals that serve as "building blocks" in making plastics, clothing, medicine and computers. AFPM has no parent company, and no publicly held company has a 10% or greater ownership interest in AFPM.

Dated: June 18, 2012                    Respectfully submitted,


/s/ *John A. Riley (by permission)*

JOHN A. RILEY                           GREG ABBOTT
CHRISTOPHER C. THIELE                   Attorney General of Texas
Bracewell & Giuliani LLP
111 Congress Avenue, Suite 2300         DANIEL T. HODGE
Austin, Texas 78701-4061                First Assistant Attorney General
Telephone: (512) 542-2108
Facsimile: (800) 404-3970               J. REED CLAY, JR.
E-mail: john.riley@bgllp.com            Special Assistant and Senior Counsel to
*Counsel for Chase Power Development, LLC*   the Attorney General


/s/ *F. William Brownell (by permission)*    /s/ *David B. Rivkin, Jr.*

F. WILLIAM BROWNELL                     DAVID B. RIVKIN, JR.
HENRY V. NICKEL                         MARK W. DELAQUIL
NORMAN W. FICHTHORN                     ANDREW M. GROSSMAN
ALLISON D. WOOD                         Baker & Hostetler LLP
Hunton & Williams LLP                   Washington Square, Suite 1100
2200 Pennsylvania Avenue, N.W.          1050 Connecticut Avenue, N.W.
Washington, D.C. 20037-1701            Washington, D.C. 20036-5304
Telephone: (202) 955-1500              Telephone: (202) 861-1500
Facsimile: (202) 778-2201              Facsimile: (202) 861-1783
E-mail: bbrownell@hunton.com           E-mail: drivkin@bakerlaw.com
*Counsel for the Utility Air Regulatory Group*   *Counsel to the State of Texas*

*/s/ Shannon S. Broome (by permission)*
CHARLES H. KNAUSS
SHANNON S. BROOME
Katten Muchin Rosenman LLP
2900 K Street, NW, North, Suite 200
Washington, DC 20007
Telephone: (202) 625-3500
Facsimile: (202) 295-1125
E-mail: shannon.broome@kattenlaw.com
*Counsel for Petitioners SIP/FIP Advocacy*
*Group, Texas Association of Business, Texas*
*Association of Manufacturers and Texas*
*Chemical Council*

MATTHEW G. PAULSON
Baker Botts LLP
98 San Jacinto Boulevard
1500 San Jacinto Center
Austin, TX 78701
Telephone: (512) 322-2500
Facsimile: (512) 322-8329
E-mail:
matthew.paulson@bakerbotts.com
*Counsel for Petitioners SIP/FIP Advocacy*
*Group, Texas Association of Business, Texas*
*Association of Manufacturers and Texas*
*Chemical Council*

ROGER R. MARTELLA, JR.
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711
E-mail: rmartella@sidley.com
*Counsel for Petitioners SIP/FIP Advocacy*
*Group, Texas Association of Business, Texas*
*Association of Manufacturers and Texas*
*Chemical Council*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES ................ i

DISCLOSURE STATEMENTS ................................................................. iv

TABLE OF CONTENTS ...................................................................... viii

TABLE OF ABBREVIATIONS ............................................................... xv

INTRODUCTION ................................................................................. 1

JURISDICTIONAL STATEMENT .............................................................. 2

STATEMENT OF ISSUES ....................................................................... 3

STATUTES AND REGULATIONS ............................................................. 4

STATEMENT OF THE CASE ................................................................... 5

    A.    Congress Intended That States Would Implement PSD Programs Through Their SIPs ......................................................... 5

        1.    The Clean Air Act's Cooperative Federalism Framework ............ 5

        2.    The SIP Submission, Approval, And Revision Process ................. 6

    B.    Submits Its PSD SIP And EPA Approves It ........................................... 9

    C.    EPA Imposes A New Greenhouse Gas Regulatory Program ............... 11

    D.    EPA Retroactively Disapproves Texas' Decades-Old PSD SIP Submission ...................................................... 14

STATEMENT OF STANDING ................................................................. 17

SUMMARY OF ARGUMENT ................................................................. 19

STANDARD OF REVIEW ..................................................................... 21

ARGUMENT ..................................................................................... 22

    A.    Clean Air Act § 110(k)(6) Does Not Authorize EPA To Rescind Its Approval Of The Texas SIP .................................................... 22

        1.    PSD SIPs Are Not Required To Contain Provisions That Trigger Implementation Of Future PSD Requirements Independent Of The Clean Air Act § 110 SIP Revision Process .................................................. 23

        2.    Clean Air Act § 110(k)(6) Is An Error Correction Provision Of Limited Scope And Effect That Does Not Authorize EPA Action To Effect New Policy Judgments ............................ 25

3.      EPA's Resort To Clean Air Act § 110(k)(6) To Change Its Prior Considered  Decision On The Texas SIP Is Unlawful ...... 31

a.      EPA's Reading of Clean Air Act § 110(k)(6) Is Contrary To The Structure Of Clean Air Act § 110 ........ 32

b.      EPA's Reading Of Clean Air Act § 110(k)(6) Contravenes Its Plain Text.................................... 35

i.      EPA Misconstrued "Was In Error"........................ 35

ii.     EPA Misconstrued "In The Same Manner" .......... 36

iii.    EPA Ignored The Significance Of "Revise Such Action"............................................... 38

iv.     EPA Ignored "As Appropriate" ............................. 39

B.      EPA Has No Inherent Authority To Disapprove Retroactively Texas' Decades-Old PSD SIP Submission ................................. 39

C.      The EPA Actions Under Review Are Erroneous Because Texas' SIP Submission Met All Relevant Clean Air Act Requirements ........... 41

D.      In Promulgating Its Interim Final Rule, EPA Unlawfully Disregarded Notice-And-Comment Rulemaking Requirements Despite Knowing Of The Purported Deficiency In Texas' PSD SIP Submission For Over 20 Years ................................... 45

E.      Petitioners' Challenges To The Interim Final Rule Are Not Moot Because They Present A Live Controversy ................................. 50

1.      Petitioners Continue To Suffer Ongoing Harm As A Direct Consequence Of EPA's Interim Final Rule ................................. 50

2.      Alternatively, Petitioners' Claims Satisfy The Exception To Mootness For Actions Capable Of Repetition Yet Evading Review ................................................. 55

CONCLUSION ................................................................. 57

CERTIFICATE OF COMPLIANCE ......................... 60

CERTIFICATE OF SERVICE ................................. 61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461 (2004) ............................... 51, 52

*Am. Bus Ass'n v. United States*, 627 F.2d 525 (D.C. Cir. 1980) ......................................... 45

*Am. Maritime Ass'n. v. United States*, 766 F.2d 545 (D.C. Cir. 1985) ............................... 52

*Appalachian Power Co. v. Train*, 566 F.2d 451 (4th Cir. 1977) ......................................... 24

*Cal. State Bd. of Optometry v. FTC*,
    No. 89-1190, 1989 WL 111595 (D.C. Cir. Aug. 15, 1989) .................................. 17

*Cannon v. Univ. of Chicago*, 441 U.S. 677, 696-97 (1997) ...................................... 27

\* *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ............... 21,35

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ................................. 22

*Coal. of Airline Pilots Ass'ns v. FAA*, 370 F.3d 1184 (D.C. Cir. 2004) ............................ 50

\* *Concerned Citizens of Bridesburg v. E.P.A.*,
    836 F.2d 777 (3d Cir. 1987) ...................................... 6, 7, 27, 28, 29, 33, 39, 40, 41

*De Jesus Ramirez v. Reich*, 156 F.3d 1273 (D.C. Cir. 1998) ................................................. 50

*Doe v. Harris*, 696 F.2d 109 (D.C. Cir. 1982) .................................................................. 56

*Duncan v. Walker*, 533 U.S. 167 (2001) ........................................................................... 34

*Envtl. Def. Fund v. EPA*, 716 F.2d 915 (D.C. Cir. 1983) ................................................... 48

*Ethyl Corp. v. EPA*, 51 F.3d 1053 (D.C. Cir. 1995) .......................................................... 22

*Honeywell Intern., Inc. v. Nuclear Regulatory Comm'n*,
    628 F.3d 568 (D.C. Cir. 2010) ............................................................................ 55

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ....................................................... 17, 18

\* *Mack Trucks, Inc. v. EPA*, No. 12-1077 (D.C. Cir. June 12, 2012). ................................. 46

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ..................................................................... 17

*McBryde v. Comm. to Review Circuit Council Conduct and Disability*,
  264 F.3d 52 (D.C. Cir. 2001) ................................................................... 56

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982) ........................ 27

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................................. 22

*Natural Res. Def. Council, Inc. v. Browner*, 57 F.3d 1122 (D.C. Cir. 1995) .............. 5, 26, 31

*Natural Res. Def. Council, Inc. v. Abraham*, 355 F.3d 179 (2d Cir. 2004) .......................... 52

*Natural Res. Def. Council, Inc. v. EPA*, 683 F.2d 752 (3d Cir. 1979) ..................... 52, 53, 54

*Natural Res. Def. Council, Inc. v. Reilly*, 983 F.2d 259 (D.C. Cir. 1993) ........................ 30

*New Jersey v. EPA*, 517 F.3d 574 (D.C. Cir. 2008) .............................................. 40

* *New Jersey v. EPA*, 626 F.2d 1038 (D.C. Cir. 1980) ...................................... 46, 48

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345 (1977) ................... 17, 52

*Petry v. Block*, 737 F.2d 1193 (D.C. Cir. 1984) ............................................ 48, 49

*Pharmachemie BV v. Barr Labs*, 276 F.3d 627 (D.C. Cir. 2002) .................................. 55

*Reeve Aleutian Airways, Inc. v. United States*, 889 F.2d 1139 (D.C. Cir. 1989) ................. 56

*S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882 (D.C. Cir. 2006) .................... 18, 30

*Seatrain Int'l v. Fed. Mar. Comm'n*, 598 F.2d 289 (D.C. Cir. 1979) ............................ 55

*Sierra Club v. Jackson*, 648 F.3d 848 (D.C. Cir. 2011) ....................................... 51

*South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498 (1986) ........................... 36

*Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352 (Fed. Cir. 2008) ............... 40

*Train v. Natural Res. Def. Council, Inc.*, 421 U.S. 60 (1975) ................................. 33

*Trimmier v. Carlton*, 296 S.W. 1070 (Tex. 1927) .......................................... 10, 56

*Union of Concerned Scientists v. Nuclear Regulatory Comm'n*,
  711 F.2d 370 (D.C. Cir. 1983) ................................................................. 52

*United States v. Cinergy Corp.*, 623 F.3d 455 (7th Cir. 2010) ................................ 53

*United States v. Gen. Motors Corp.*, 876 F.2d 1060 (1st Cir. 1989)........................................ 5

*United States v. Navistar Int'l Transp. Corp.*, 152 F.3d 702 (7th Cir. 1998) ........................ 37

*United States v. Township of Brighton*, 153 F.3d 307 (6th Cir. 1998)................................... 37

*Utility Air Regulatory Group v. EPA*, No. 11-1037 (D.C. Cir.) .................................... 14, 54

*Virginia v. EPA*, 108 F.3d 1397 (D.C. Cir. 1997),
    *modified on other grounds*, 116 F.3d 499 (D.C. Cir. 1997) ......................................... 26, 39

*Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457 (2001)......................................... 1

**Federal Statutes**

* 5 U.S.C. § 553 ...............................................................................................15, 45

5 U.S.C. § 706.............................................................................................. 21

42 U.S.C. § 7401 ............................................................................................ 5

* 42 U.S.C. § 7410 .................................................5, 7, 8, 9, 26, 27, 28, 33, 34, 41, 42

42 U.S.C. § 7413 ........................................................................................... 53

42 U.S.C. § 7471 ...................................................................................5, 6, 42

42 U.S.C. § 7477 ........................................................................................... 53

* 42 U.S.C. § 7607 ....................................................................................2, 21, 45

**State Statutes**

Fla. Stat. § 120.54(1)(i) (2011) .......................................................................... 10

Idaho Code Ann. § 67-5229(3) ........................................................................... 10

Or. Admin. R. § 340-200-0040(2).......................................................................... 10

**Federal Regulations**

1 C.F.R. § 51.11.............................................................................................. 25

40 C.F.R. § 51.102 ........................................................................................... 7

40 C.F.R. § 51.166 .................................................................................7, 8, 24, 25

40 C.F.R. § 51.230 .................................................................. 43

40 CFR 52.21 .......................................................................... 6

37 Fed. Reg. 10,842, (May 31, 1972) ...................................... 9

48 Fed. Reg. 6,023 (Feb. 9, 1983) ........................................... 9

52 Fed. Reg. 24,634 (July 1, 1987) .................................... 10, 44

54 Fed. Reg. 52,823 (Dec. 22, 1989) ....................................... 7

* 57 Fed. Reg. 28,093 (June 24, 1992) ........................... 9, 11, 44

68 Fed. Reg. 8,845 (Feb. 26, 2003) ........................................ 10

74 Fed. Reg. 66,496 (Dec. 15, 2009) ..................................... 12

75 Fed. Reg. 17,004 (Apr. 2, 2010) ........................................ 12

75 Fed. Reg. 25,324 (May 7, 2010) ........................................ 12

75 Fed. Reg. 31,514 (June 3, 2010) ............................ 12, 13, 24

75 Fed. Reg. 53,892 (Sept. 2, 2010) ....................................... 14

75 Fed. Reg. 77,698 (Dec. 13, 2010) ..................................... 15

75 Fed. Reg. 82,365 (Dec. 30, 2010) ..................................... 16

* 75 Fed. Reg. 82,430 (Dec. 30, 2010) ............. 2, 15, 16, 17, 23, 39, 42, 44, 46, 47, 48, 49

* 76 Fed. Reg. 25,179 (May 3, 2011) ............. 2, 10, 17, 27, 31, 36, 40, 42, 43, 44

**Other Authorities**

Comments of the Texas Office of Attorney General,
  EPA-HQ-OAR-2010-1033-0232 (Feb. 14, 2011) ........................... 16, 35

Comments of Petitioner The Utility Air Regulatory Group,
  EPA-HQ-OAR-2010-1033-0228 (Feb. 14, 2011) ........................... 16

Comments of Petitioner National Association of Manufacturers, et al.,
  EPA-HQ-OAR-2010-1033-0227 (Feb. 14, 2011) ........................... 16

Declaration of Regina McCarthy (Oct. 28, 2010) ..................................... 1, 14, 16, 19, 47

H.R. Rep. No. 95-294 (May 12, 1977),
   *reprinted in* 1977 U.S.C.C.A.N. 1077, 1225 ............................................... 6

Hon. Henry A. Waxman, et al., *Roadmap to Title I of the Clean Air Act Amendments
   of 1990: Bringing Blue Skies Back to America's Cities* ...................................... 9, 20, 30

EPA's Submission to the Office of Management and Budget,
   EPA-HQ-OAR-2010-0107-0127 (Nov. 16, 2010) ......................................... 15, 47

Letter from Greg Abbott and Bryan W. Shaw to Lisa Jackson and Alfredo
   Armendariz (Aug. 2, 2010) ................................................................... 13

Memorandum from Darryl D. Tyler, Director, Control Programs Development
   Division, to Regional Air Directors (Aug. 5, 1987) ......................................... 11

*Webster's Third New International Dictionary* (1971) ............................................ 38

## TABLE OF ABBREVIATIONS

**APA**                    Administrative Procedure Act

**CAA**                    Clean Air Act

**EPA**                    United States Environmental Protection Agency

**FIP**                    Federal Implementation Plan

**GHG**                    Greenhouse Gases

**LBEC**                   Las Brisas Energy Center

**NAAQS**                  National Ambient Air Quality Standard

**OMB**                    Office of Management and Budget

**PM**                     Particulate Matter

**PSD**                    Prevention of Significant Deterioration

**SIP**                    State Implementation Plan

**TACB**                   Texas Air Control Board

**TCEQ**                   Texas Commission on Environmental Quality

## INTRODUCTION

For nearly two decades, Texas maintained and implemented an EPA-approved major source preconstruction permitting program.  This program made Texas the sole permitting authority for new major sources in the State, and allowed it to manage its air quality resources and issue permits in a timely manner.  But when EPA set out to impose its greenhouse gas ("GHG") regulatory agenda, it determined that Texas' permitting program, and the procedural regularities required for its revision, were obstacles to the Agency's chosen regulatory timetable.  EPA's solution:  to disapprove retroactively Texas' Clean Air Act ("CAA") state plan submission decades after EPA originally approved it, and to base its disapproval on information about Texas' procedures for revising its plan that EPA knew of when it originally approved the submission. Having disapproved Texas' plan, in December 2010, EPA promulgated the same federal GHG-permitting authority that it had represented to this Court only two months earlier could not be implemented until December 2011 "at the earliest." Att. 1 to Decl. of Regina McCarthy (Oct. 28, 2010) ("McCarthy Decl."), J.A. __.

EPA claims to find authority for these actions in CAA § 110(k)(6).  But "Congress … does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."  *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).  According to its text and structure, CAA § 110(k)(6) is nothing more than a limited error-correction provision meant to deal with minor clerical or technical errors, not

carte blanche for EPA to revoke decades-old decisions that were statutorily compelled at inception but failed to predict changed EPA policy.  Likewise, EPA's assertion of inherent authority is incompatible with the Act's specific limitations on EPA's discretion.  And EPA's decision to act without notice and comment—itself unjustified and unlawful—only confirms the arbitrary nature of the Agency's actions.

Regardless of whether this Court ultimately upholds EPA's GHG regulations—a decision it likely will reach before the conclusion of this litigation— EPA was bound to follow the Act's procedural regularities in implementing those actions.  Its failure to do so, if upheld, could legitimize EPA in the future to divest states of their lawful regulatory authority whenever it is convenient or conducive to EPA's policy goals.  The only way this Court can uphold the integrity of the CAA's procedural protections, which act to safeguard *all parties* from *ad hoc* and arbitrary agency actions, is to vacate the actions under review.

## JURISDICTIONAL STATEMENT

Pursuant to 42 U.S.C. § 7607(b)(1), this Court has jurisdiction over the *Determinations Concerning Need for Error Correction, Partial Approval and Partial Disapproval, and Federal Implementation Plan Regarding Texas Prevention of Significant Deterioration Program*, 75 Fed. Reg. 82,430 (Dec. 30, 2010) ("Interim Final Rule"), and the *Determinations Concerning Need for Error Correction, Partial Approval and Partial Disapproval, and Federal Implementation Plan Regarding Texas's Prevention of Significant Deterioration Program*, 76 Fed. Reg. 25,178 (May 3, 2011) ("Final Rule").  Timely petitions for review of the Interim

Final Rule were filed by Petitioners Texas and Chase Power Development, LLC ("Chase Power"), and timely petitions for review of the Final Rule were filed by all Petitioners. The bases for Petitioners' standing and the response of Petitioners Texas and Chase Power to EPA's claims that their challenges to the Interim Final Rule are moot are discussed *herein*. *See infra* at 17-19, 50-57.

## STATEMENT OF ISSUES

1.      CAA § 110 establishes a comprehensive mechanism for states to implement the Act through state implementation plans ("SIPs") and for EPA to act on their SIP submissions. One subsection, CAA § 110(k)(6), allows EPA in limited circumstances to make minor "corrections" to an action approving or disapproving a state's SIP submission. Did EPA exceed its limited authority by retroactively disapproving Texas' Prevention of Significant Deterioration ("PSD") SIP submission based on EPA's changed interpretation of the CAA?

2.      CAA § 110 establishes a comprehensive mechanism for states to implement the Act through SIPs and for EPA to request and act on states' SIP submissions. Did EPA act unlawfully by claiming inherent authority to reverse its decades-old decision to approve Texas' PSD SIP submission in a manner that is contrary to this statutory mechanism?

3.      CAA § 110(k)(3) requires EPA to approve a SIP submission that meets the Act's minimum requirements. In 1992, EPA made the considered decision that Texas' PSD SIP submission met all applicable CAA and regulatory requirements and

thus approved it. Did EPA err by revoking its 1992 decision to approve Texas' PSD SIP submission based on criteria that are not required by the CAA or EPA's regulations?

4.    In December 2010, EPA disapproved retroactively Texas' decades-old PSD SIP submission without notice and comment procedures, claiming that its failure to follow such procedures was justified by the "good cause" provision in the Administrative Procedure Act ("APA"). But EPA had known about all of the purported deficiencies in Texas' PSD SIP submission for over two decades before its retroactive disapproval. Was EPA's decision to disregard the APA's rulemaking requirements based on information it had known for decades erroneous?

5.    During the pendency of EPA's Interim Final Rule, Texas issued three PSD permits applicable to pollutants other than GHG, including a permit to Petitioner Chase Power. If the Interim Final Rule is vacated, these sources may begin actual construction without GHG limits, and, if EPA contests the right to construct, it must do so in the district court. Given these continuing consequences and the likelihood this situation could recur, is Petitioners' challenge to the Interim Final Rule moot?

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the attached Addendum.

## STATEMENT OF THE CASE

**A.   Congress Intended That States Would Implement PSD Programs Through Their SIPs**

### 1.     The CAA's Cooperative Federalism Framework

The CAA "establishes a partnership between EPA and the states for the attainment and maintenance of national air quality goals." *Natural Res. Def. Council, Inc. v. Browner*, 57 F.3d 1122, 1123 (D.C. Cir. 1995).   Under this partnership, "air pollution prevention … at its source is the *primary* responsibility of states and local governments[.]"   42 U.S.C. § 7401(a)(3) (emphasis added).   Accordingly, "the states retain wide latitude in choosing how best to achieve national standards, given local needs and conditions." *United States v. Gen. Motors Corp.*, 876 F.2d 1060, 1062 (1st Cir. 1989).

States implement the CAA primarily through SIPs.   Among the programs that states are required to implement through their SIPs is the PSD program, which is a preconstruction review and permitting program. *See* 42 U.S.C. § 7471.   As its name suggests, the program seeks to prevent air quality from deteriorating such that areas meeting federal ambient air quality standards would no longer meet such standards.

A SIP compiles the state's laws and regulations for complying with the national ambient air quality standards ("NAAQS"). *See* 42 U.S.C. § 7410(a).   "The SIP basically embodies a set of choices regarding such matters as transportation, zoning and industrial development that the state makes for itself in attempting to reach the

5

NAAQS with minimum dislocation." *Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777, 780-81 (3d Cir. 1987) (Becker, J.).  Because decisions about the allocation of air quality resources implicate quintessentially local concerns, Congress "carefully balanced State and national interests by providing for a fair and open process in which State and local governments and the people they represent will be free to carry out the reasoned weighing of environmental and economic goals and needs."  H.R. Rep. No. 95-294, at 146 (May 12, 1977), *reprinted in* 1977 U.S.C.C.A.N. 1077, 1225.

### 2.    The SIP Submission, Approval, And Revision Process

CAA § 110 establishes the framework for SIP development, submission, and revision.  In order to ensure the ability of states to plan for attainment and to maintain state primacy in air pollution control, Congress required that EPA provide states and regulated entities with advance notice about the requirements that plan submissions would need to meet and denied EPA authority to accept or reject those submissions based on *ad hoc* criteria.  Most notably, Congress expressly required EPA to publish regulations to guide state implementation of the program through SIPs.  *See* 42 U.S.C. § 7471.  EPA, in turn, has promulgated regulations at 40 C.F.R. Part 51 that implement CAA § 110 and that set forth minimum standards for approvable SIPs.  Construing properly the statutory scheme created by Congress, EPA has long maintained that "any fundamental changes in the administration of PSD would have to be accomplished through amendments to the regulations in 40 CFR 52.21 and 51.166, and subsequent SIP revisions."  *See* 54 Fed. Reg. 52,823, 52,824/3 (Dec. 22,

1989).

The SIP submittal and approval process is detailed and circumscribes EPA's discretion. First, the states must formulate and adopt a plan that meets the criteria set forth at CAA § 110 and 40 C.F.R. Part 51. *See* 42 U.S.C. § 7410(k)(1)(A) (requiring that EPA "promulgate minimum criteria that any plan submission must meet before the Administrator is required to act on such submission"). State SIP submissions are subject to a lengthy state-level administrative process before they even reach EPA, including "reasonable notice and public hearing." 42 U.S.C. § 7410(a)(2), (*l*); 40 C.F.R. § 51.102. After EPA receives a state's submission, it has six months to determine whether the submission is complete, *see* 42 U.S.C. § 7410(k)(1)(B), and must approve or disapprove a complete submission in the subsequent twelve months, *see* 42 U.S.C. § 7410(k)(2). EPA has no choice but to "approve such submittal as a whole if it meets all of the applicable requirements" of the Act. 42 U.S.C. § 7410(k)(3).

As with plan submissions, the Act "places primary responsibility on the states for [plan] revision." *Bridesburg*, 836 F.2d at 781. The Act provides three mechanisms for revising approved SIPs, each applicable in different circumstances. The first applies when EPA amends its minimum plan requirements. Because the plan revision process is time-consuming and costly, and respectful of the states' sovereign dignity, Congress provided states up to three years to revise their plans after EPA adopts or revises a NAAQS. 42 U.S.C. § 7410(a)(1). Mindful of Congress' decision to provide time for states to respond to fundamental changes to SIP requirements and the Act's

failure to specify a deadline for plan revisions following EPA's revisions to the PSD program, EPA adopted this three-year deadline for that program. *See* 40 C.F.R. § 51.166(a)(6)(i).

Second, under CAA § 110(k)(5), EPA may call for SIP revisions of plans that are "substantially inadequate to attain or maintain the relevant [NAAQS], to mitigate adequately … interstate pollutant transport … or to otherwise comply with any requirement of this chapter[.]" 42 U.S.C. § 7410(k)(5). To ensure that CAA § 110(k)(5) would not inappropriately displace the standard SIP revision procedures in § 110(a), Congress limited the scope of § 110(k)(5) to deficiencies regarding "requirements of this chapter to which the State was subject when it developed and submitted the plan[.]" 42 U.S.C. § 7410(k)(5); *see also* § 7410(i) (generally prohibiting imposition of new stationary source requirements outside the § 110(a) process). Significantly, even when EPA may require plan revisions under CAA § 110(k)(5), Congress ensured that states would have sufficient time to act and to meet state law procedural requirements for rulemaking by providing that states would not be required to act immediately, but that EPA should "establish reasonable deadlines (not to exceed 18 months after the date of such notice) for the submission of such plan revisions." 42 U.S.C. § 7410(k)(5).

Third and finally, CAA § 110(k)(6) provides a limited authority for EPA to "correct" its actions on SIP submissions that were in error when those actions were taken. CAA § 110(k)(6) provides that "the Administrator may in the same manner as

the approval, disapproval, or promulgation [of a SIP] revise such action as appropriate[.]"  42 U.S.C. § 7410(k)(6).  Representative Henry Waxman, who was Chairman of the House Energy and Commerce Committee's Subcommittee on Health and Environment during the passage of the CAA Amendments of 1990, explained his intent regarding this provision in a post-enactment article, stating that it was "included to enable EPA to deal promptly with clerical errors or technical errors," but not "to offer a route for EPA to reevaluate its policy judgments."[1]

## B.    Texas Submits Its PSD SIP And EPA Approves It

Texas has had an approved SIP since 1972.  *See* 37 Fed. Reg. 10,842, 10,895-98/1 (May 31, 1972).  In 1983, Texas was delegated authority to implement the PSD program.  *See* 48 Fed. Reg. 6,023/2 (Feb. 9, 1983).  Following this delegation, Texas submitted several SIP revisions to enable it to administer the PSD program (collectively the "PSD SIP submission").  EPA approved Texas' PSD SIP in 1992, granting the State full authority to implement the PSD program.  *See* 57 Fed. Reg. 28,093/3 (June 24, 1992).

---

[1] Hon. Henry A. Waxman et al., *Roadmap to Title I of the Clean Air Act Amendments of 1990: Bringing Blue Skies Back to America's Cities*, 21 Envt'l L. 1843, 1925 (1991).

The Texas PSD SIP submission and approval proceedings produced an unusually well-developed record on how the State would address the applicability of newly-regulated pollutants to the PSD program.  During the SIP submission process, Texas unambiguously and consistently explained to EPA that the PSD provisions in its SIP are not "prospective rulemaking" and do not incorporate future EPA interpretations of the Act or its regulations.  *See* 76 Fed. Reg. at 25,184/2 n.21, J.A. __; Letter from William B. Hathaway, EPA Region 6, to Allen Eli Bell, TACB, 2 (July 3, 1986), J.A. __.  In this regard, Texas' position preventing prospective incorporation by reference is required by state law, which disfavors such actions.  *See Trimmier v. Carlton*, 296 S.W. 1070 (Tex. 1927).  Just as importantly, Texas' position was no impediment to EPA approval—many SIPs do not, for example, automatically update to incorporate EPA's changed regulations.  *See* 68 Fed. Reg. 8,845/2 (Feb. 26, 2003) (Kansas SIP); Fla. Stat. § 120.54(1)(i) (2011) (Florida state rulemaking provision); Idaho Code Ann. § 67-5229(3) (Idaho state rulemaking provision); Or. Admin. R. § 340-200-0040(2) (Oregon SIP).

While EPA was considering Texas' PSD SIP submission, it was also in the process of revising the particulate matter NAAQS.  When Texas initially submitted its PSD SIP in 1985, EPA had not promulgated the NAAQS for particulate matter smaller than 10 microns ("$PM_{10}$").  After EPA promulgated that standard in 1987, *see* 52 Fed. Reg. 24,634/1 (July 1, 1987), EPA continued to permit new sources with respect to their $PM_{10}$ emissions, and Texas began to revise its PSD SIP submission so

10

that these substances would be regulated under the relevant SIP provisions. *See* 76 Fed. Reg. at 25,184/2 n.24, J.A. __. It took Texas approximately fifteen months to revise its SIP submission to include the new NAAQS pollutant, and EPA another four years to approve the submission. *See* 57 Fed. Reg. 28,093/3 (June 24, 1992). Thus, EPA had first-hand experience with Texas' process for incorporating new pollutants into its SIP-approved PSD program.

And Texas' actions were wholly consistent with EPA's contemporaneous view of the Act. EPA directly addressed the question of $PM_{10}$'s applicability in states with SIP-approved PSD programs by requiring states that could not reinterpret their SIPs to enforce them by their terms: "In States where an approved PSD SIP currently exists, each State should revise its rules to fully address the new $PM_{10}$ indicator by May 1, 1988. Until the new PSD procedures are approved by EPA as SIP revisions, States must continue to implement their existing PSD rules for particulate matter." Memorandum from Darryl D. Tyler, Director, Control Programs Development Division, to Regional Air Directors 3 (Aug. 5, 1987), J.A. __. Even today, EPA asserts discretion to issue PSD permits that do not include emission limits for newly-regulated pollutants. *See* EPA, Supplemental Statement of Basis: PSD Permit Application for Avenal Energy Project, March 2011, at 2-3, J.A.__.

## C.    EPA Imposes A New Greenhouse Gas Regulatory Program

EPA historically has taken the position that GHGs are not regulated under the CAA, and GHGs unquestionably were not regulated when EPA approved Texas' SIP

11

in 1992. Beginning in December 2009, however, EPA finalized four actions regulating GHG under the CAA. *See* 74 Fed. Reg. 66,496 (Dec. 15, 2009); 75 Fed. Reg. 17,004 (Apr. 2, 2010) ("Timing Rule"); 75 Fed. Reg. 25,324 (May 7, 2010); 75 Fed. Reg. 31,514 (June 3, 2010) ("Tailoring Rule").[2]

As part of these rules, EPA determined that, once GHGs were actually being controlled under any part of the Act, they were "subject to regulation" under the PSD program. 75 Fed. Reg. 17,004, 17,006/1-17,007/3 (Apr. 2, 2010). Specifically, EPA took the position that, beginning on January 2, 2011, GHG control requirements would be required under the PSD program as outlined in EPA's rules. *Id.*

EPA's regulation of GHGs under the CAA presented significant difficulties for the Agency and states, particularly with regard to the PSD program. For one thing, the most common GHG, $CO_2$, is emitted in quantities that dwarf the major source thresholds for program applicability. As a result, under EPA's interpretation of the Act,[3] PSD requirements could have expanded from approximately 300 issued permits

---

[2] Petitioners in this case have also commenced challenges to the rulemakings EPA initiated in 2009.

[3] Petitioners and certain members of Petitioners are currently challenging, in separate litigation pending in this Court, EPA's statutory interpretation that GHGs can be subject to or trigger PSD permitting requirements and nothing in this brief should be construed to concede that point.

annually to more than 80,000.  To avoid this result, EPA rewrote the Act's statutory emission rate applicability thresholds to exclude most of this new construction activity from the PSD program by newly defining the statutory term, "subject to regulation." 75 Fed. Reg. at 31,606/1-31,607/3.

Furthermore, EPA's position on the timing of GHG regulations created practical difficulties about how EPA could rush its regulatory regime into place in states with approved SIPs, rather than allowing them the opportunity to make orderly SIP revisions.  EPA's solution was to threaten a construction moratorium under which states that were unable to reinterpret retroactively their existing SIPs or to complete SIP revisions within a matter of weeks would be unable to permit construction of GHG-emitting sources—unless, of course, they ceded permitting authority to EPA.  *See* 75 Fed. Reg. at 31,582-31,583.

Texas advised EPA that it could not retroactively reinterpret its SIP to cover GHGs, which were not regulated at the time Texas' SIP was approved in 1992 and were, in fact, a composite pollutant defined for the first time in the Tailoring Rule.  *See* Letter from Greg Abbott and Bryan W. Shaw to Lisa Jackson and Alfredo Armendariz (Aug. 2, 2010), at 1-2, J.A. __.  Texas also explained the position it was taking in litigation challenging EPA's GHG rules, that the PSD program properly only encompassed NAAQS pollutants, but confirmed as a regulatory matter that its approved PSD program "encompasses all 'federally regulated new source review

13

pollutants,' including 'any pollutant that otherwise is subject to regulation under the [CAA].'" *See id.* at 2-3 (quoting 30 Tex. Admin. Code § 116.12(14)(D)).

Following promulgation of the Tailoring Rule, EPA issued a proposed "SIP call" finding the SIPs of thirteen states, including Texas', "substantially inadequate." *See* 75 Fed. Reg. 53,892, 53,899/2-53,900/1 (Sept. 2, 2010). EPA proposed to require these states in their SIP-approved PSD programs to regulate GHGs as defined in the Tailoring Rule. EPA also proposed a FIP that would apply specifically to states that did not or could not agree to "reinterpret" their SIPs to impose the Tailoring Rule and did not meet SIP submission deadlines that would fall no later than December 1, 2011. *See id.* at 53,900/2-3. EPA finalized its GHG SIP Call on December 13, 2010 and required Texas to submit revisions to its SIP by December 1, 2011. 75 Fed. Reg. 77,698, 77,705 (Dec. 13, 2010). The GHG SIP Call is the subject of litigation in *Utility Air Regulatory Group v. EPA ("UARG")*, No. 11-1037 (D.C. Cir.).

## D. EPA Retroactively Disapproves Texas' Decades-Old PSD SIP Submission

Consistent with EPA's position in the proposed GHG SIP Call and FIP, EPA Assistant Administrator McCarthy promised this Court in an attachment to her sworn statement that a "FIP cannot be promulgated until December 2, 2011 at the earliest" for Texas. Att. 1 to McCarthy Decl., J.A. __. Contemporaneous with this statement to the Court, however, EPA was secretly "planning additional actions" to ensure (as EPA characterized it) that GHG sources in Texas could receive GHG PSD permits as

14

of January 2, 2011.  EPA-HQ-OAR-2010-0107-0127 at 11, J.A. __ (EPA's Nov. 16, 2010, submission to the Office of Management and Budget ("OMB")); *see also* 75 Fed. Reg. 77,698, 77,700/2.

Rather than inform the public about these "additional actions," on December 30, 2010, EPA published an interim final rule partially disapproving Texas' SIP, imposing the GHG FIP, and purporting to be effective as of its date of publication. *See* 75 Fed. Reg. at 82,430/1-2, J.A. __.  EPA eschewed notice and comment rulemaking procedures and instead purported to rely on APA § 553(b)(3)(B)'s "good cause" exception, finding that notice and comment is "impracticable" and would be "contrary to the public interest."  *Id.* at 82,458/2 (quoting 5 U.S.C. § 553(b)(3)(B)), J.A. __.  The effect of EPA's action was that major source preconstruction permitting authority was divided "between two authorities—EPA for GHGs and the state [of Texas] for all other pollutants," *id.* at 82,457/2, J.A. __, making EPA the final decision-maker of whether new sources could be constructed in Texas.

As substantive grounds for the Interim Final Rule, EPA argued that CAA § 110(k)(6) authorized it to change its decades-old approval of Texas' PSD SIP submission into a partial approval and partial disapproval.  EPA asserted it had erroneously approved Texas' PSD SIP submission because the SIP did not address appropriately the applicability of newly-regulated pollutants to the PSD program in the future.  75 Fed. Reg. at 82,431/2-82,432/1, J.A. __.  Alternatively, EPA argued

that it had inherent authority to disapprove the decades-old submission on these same grounds.

EPA claimed that its action was independent of the GHG SIP Call because that action was aimed at a "narrower" issue of "appl[icability] to GHGs," whereas its decision retroactively disapproving Texas' PSD SIP submission was addressed to Texas' purported "failure to address, or assure legal authority for, application of PSD to all pollutants newly subject to regulation." 75 Fed. Reg. at 82,455/1 n.85, J.A. __. But rather than remedy the purported deficiency in Texas' decades-old PSD SIP submission, EPA imposed the same GHG SIP Call FIP on Texas that it had represented to the Court could not "be promulgated until December 2, 2011 at the earliest." Att. 1 to McCarthy Decl., J.A. __. EPA did not attempt to tailor the FIP to any purported deficiencies in Texas' previously-approved SIP submission.

Concurrently, EPA requested comment on whether to promulgate a final rule, in addition to the Interim Final Rule, disapproving Texas' PSD SIP submission and imposing a FIP for PSD regulation of GHG emissions. *See* 75 Fed. Reg. 82,365 (Dec. 30, 2010). Texas and other commenters submitted detailed comments explaining why this action was unlawful and unwise. *See, e.g.*, EPA-HQ-OAR-2010-1033-0232 (Comments of Petitioner Texas) (Feb. 14, 2011), J.A. __; EPA-HQ-OAR-2010-1033-0228 (comments of Petitioner UARG) (Feb. 14, 2011); EPA-HQ-OAR-2010-1033-0227 (comments of Petitioner National Association of Manufacturers, et al.) (Feb. 14, 2011), J.A. ___. On May 3, 2011, EPA rejected these concerns and published the

16

Final Rule disapproving retroactively Texas' decades-old PSD SIP submission and promulgating the FIP. *See* 76 Fed. Reg. 25,178. EPA did not change its rationale between the Interim Final Rule and Final Rule—indeed, most of the Final Rule appears to be a "cut-and-paste" from its previous rule.

## STATEMENT OF STANDING

Petitioners satisfy the three elements of Article III standing—injury, causation, and redressability. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Petitioner Texas' injury is plain. EPA's decisions to disapprove retroactively Texas' PSD SIP submission and to impose a FIP installing EPA as the permitting authority for major industrial sources with regard to GHGs injure the State's quasi-sovereign interest in regulating air quality within its borders. *See Massachusetts v. EPA*, 549 U.S. 497, 520 (2007); *see also New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345 (1977) (Rehnquist, J., as Circuit Justice); *Cal. State Bd. of Optometry v. FTC*, No. 89-1190, 1989 WL 111595 at *1 (D.C. Cir. Aug. 15, 1989).

Members of Petitioners the SIP/FIP Advocacy Group, Texas Chemical Council, Texas Association of Business, and Texas Association of Manufacturer and members of Petitioner UARG are adversely affected by EPA's rule. It imposes on them binding requirements regarding permitting and regulation of GHGs under the PSD program. These requirements create significant costs and other burdens for affected facilities. Members of these Petitioners therefore would have individual standing as a result of concrete and particularized injury that is fairly traceable to

EPA's rule and as to which there is a substantial probability of redress by a decision that holds the rule invalid. These Petitioners have associational standing here because: (1) individual members of each would have standing in their own right; (2) the interests these Petitioners seek to protect here are germane to the purpose of advancing their members' interests in lawful and reasonable regulatory decisions under the CAA; and (3) neither the claims asserted nor the relief requested requires individual members' participation. *See, e.g.*, *S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 895 (D.C. Cir. 2006), *clarified on reh'g on other grounds*, 489 F.3d 1245 (D.C. Cir. 2007).

Chase Power's injury arises from EPA's promulgation of the Interim Final Rule. Chase Power is engaged in the development of the Las Brisas Energy Center ("LBEC"), a 1,200 megawatt, petroleum coke-fueled power generating station in Corpus Christi, Texas. It received from the Texas Commission on Environmental Quality ("TCEQ") a signed PSD permit for the LBEC in the interim between EPA promulgating the Interim Final Rule and the Final Rule, calling into question whether TCEQ issued a complete PSD permit for the LBEC and delaying construction of the LBEC.

A decision vacating the actions under review will redress Petitioners' injuries. When the complainant is the object of government action, "there is ordinarily little question that the action … has caused him injury, and that a judgment preventing … the action will redress it." *Lujan*, 504 U.S. at 561-62. A judgment that EPA acted

unlawfully and vacating the decisions under review will redress the harm that EPA has caused by vacating the actions by which EPA supplanted Texas' right to regulate air quality. It would also allow Chase Power to begin actual construction in reliance on preconstruction permits that Texas has issued during the pendency of the Interim Final Rule.

## SUMMARY OF ARGUMENT

Since 1992, Texas has maintained and implemented an EPA-approved PSD permitting program. But in December 2010, only two months after the Assistant Administrator represented to this Court that EPA could not impose a FIP to replace a SIP that did not conform to newly enacted GHG regulations until December 2011 "at the earliest," Att. 1 to McCarthy Decl., J.A. __, EPA moved without notice and comment to disapprove retroactively Texas' 1992 SIP submission based on information that EPA knew of when it approved the SIP and implemented its GHG FIP. EPA then published a final rule on the same grounds. EPA's actions are unlawful and arbitrary and capricious, and should be vacated.

CAA § 110 establishes a comprehensive regulatory process for SIP submittals, approvals, and revisions that displaces any authority EPA otherwise might have to act on SIP submissions. By every indication, Congress intended SIPs to be a durable manifestation of cooperative federalism, not something to be displaced at EPA's whim. In this regard, CAA § 110(k)(6), EPA's ostensible source of authority, was explained by one lawmaker as merely "enabl[ing] EPA to deal promptly with clerical

19

errors or technical errors." Waxman, *supra*, at 1925. But the decisions under review attempt to transform Subsection 110(k)(6) into a source of unlimited revisory power that could be used to override any SIP any time EPA purports to find fault with it or shifts its policy direction. There is no limiting principle to EPA's interpretation underlying its unlawful and arbitrary actions, and the Court should vacate those actions.

EPA's actions disapproving Texas' PSD SIP submittal are also erroneous because the submittal met all requirements of the Act. EPA may not revoke its earlier approval decision based on a shift in the Agency's policy judgment. The Court should vacate the actions and preclude EPA from circumventing the procedural requirements of the CAA's SIP revision process.

Finally, EPA's decision to disregard the procedural requirements of notice-and-comment rulemaking fatally undermines the Interim Final Rule. Notwithstanding EPA's self-serving denials, the purported deficiency in Texas' decades-old PSD SIP submission—its failure to predict EPA's future interpretations of the Act and to apply its PSD program to pollutants that become subject to regulation long after its submission and approval—were fully known to EPA in 1992. Even if EPA's claims were consistent with the administrative record, it still would have known about the purported deficiency in Texas' PSD SIP submission by early August 2010, which allowed EPA more than enough time to undertake notice-and-comment rulemaking.

EPA's decision to shield its actions from the public until the last possible minute is unlawful and merits vacatur of the Interim Final Rule.

## STANDARD OF REVIEW

EPA's actions disapproving retroactively Texas' PSD SIP submission are rules within the meaning of APA §§ 551(4) and 553. They are subject to review under the APA's legal standards, 5 U.S.C. § 706, including standards proscribing agency actions that are arbitrary and capricious, an abuse of discretion, or otherwise contrary to law. EPA's actions imposing the FIP constitute "promulgation or revision of an implementation plan by the Administrator" under CAA § 110(c). 42 U.S.C. § 7607(d)(1)(B). Thus, this Court reviews the FIP pursuant to the standards in CAA § 307(d), 42 U.S.C. § 7607(d)(9), including standards proscribing EPA actions that are arbitrary and capricious, an abuse of discretion, or otherwise contrary to law.

EPA's legal interpretations of the CAA are subject to the standard set forth in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). The Court first must ask "whether Congress has directly spoken to the precise question at issue. If the intent of Congress' is clear, that is the end of the matter" and Congress' decision controls. *Id.* at 842-43. If "the statute is silent or ambiguous with respect to the specific issue," then "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

EPA's non-factual determinations and explanation for its actions are reviewed under the arbitrary-and-capricious test, which requires an agency to "articulate a

satisfactory explanation for its action" and forbids it from "entirely fail[ing] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court considers only the regulatory rationale the agency actually offered in reaching its decision. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). Review under the CAA's "arbitrary and capricious" standard is the same as under the APA. *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1064 (D.C. Cir. 1995).

## ARGUMENT

### A.    CAA § 110(k)(6) Does Not Authorize EPA To Rescind Its Approval Of The Texas SIP

EPA's central justification for the Texas FIP is that the PSD SIPs it previously approved without providing for "automatic application of PSD to newly regulated pollutants" like GHGs may now be retroactively disapproved and supplanted by a FIP that changes fundamentally the scope of that EPA-approved SIP.[4] The Texas PSD SIP that EPA approved in 1992, of course, did not apply to GHGs or the tens of thousands of sources that emit GHGs in amounts of at least 100 or 250 tons per year. Now, EPA asserts it can "correct" the putative "error" it made years ago when

---

[4] 76 Fed. Reg. at 25,182/3, J.A. __; 75 Fed. Reg. at 82,443/3, J.A. __.

it approved a SIP that did not foresee regulation of those thousands of GHGs—an approval made at a time when EPA itself did not even consider GHG sources a CAA "pollutant"—thereby transforming the long-ago SIP "approval" into a long-ago SIP "disapproval" and allowing EPA to impose a fundamentally different and significantly more expansive permitting program.  This Orwellian magic, EPA claims, is authorized by CAA § 110(k)(6).  But, under the CAA and basic principles of administrative law, EPA cannot use § 110(k)(6) to rewrite history to justify EPA's promulgation of a fundamental change in the Texas PSD program.

1.    **PSD SIPs Are Not Required To Contain Provisions That Trigger Implementation Of Future PSD Requirements Independent Of The CAA § 110 SIP Revision Process**

EPA's 40 C.F.R. part 51 rules establish minimum requirements for SIP PSD programs.  Revision of SIP-approved PSD programs has always been required as the means to implement new Part 51 requirements that change the nature or scope of an approved PSD SIP program.  Nothing in the Act or 40 C.F.R. § 51.166 even contemplates, much less authorizes, provisions in PSD SIPs that require implementation of unknown and unascertainable future changes to the scope and applicability of PSD without following the SIP-revision process.  No legal basis exists for an interpretation of an EPA-approved PSD SIP as requiring—outside the SIP revision process (*i.e.*, without new public hearings and EPA approval)—either that GHGs be treated in the same way as other PSD-regulated pollutants (which, by extending PSD to thousands of additional sources that were never previously subject

23

to PSD and that would become subject to PSD only due to their GHG emissions, would transform approved PSD programs into something unrecognizable) or that EPA's elaborate Part 51 GHG Tailoring Rule be incorporated in the SIP.[5]

EPA's underlying premise is that, by generally referencing "regulated pollutant," a PSD SIP would require that new, substantive PSD requirements, such as the Tailoring Rule's detailed definition of "greenhouse gases" and related provisions governing PSD applicability become a part of the approved SIP program without SIP revision. This contravenes fundamental principles of administrative law and the CAA itself. Under the APA, for example, "incorporations by reference" must be approved by the Director of the *Federal Register* and cannot be updated or changed without new public notice-and-comment proceedings. *See* 1 C.F.R. pt. 51; 1 C.F.R. § 51.11; *see also Appalachian Power Co. v. Train*, 566 F.2d 451, 455-57 (4th Cir. 1977). Similarly, because CAA § 110(a)(2) and 110(*l*) require that any revision to an approved SIP be preceded

---

[5] EPA itself admitted, in promulgating the Tailoring Rule, that it was "not too much to say that applying PSD requirements literally to GHG sources" would "result in a program that would have been unrecognizable to the Congress that designed PSD." 75 Fed. Reg. at 31,555. It was for that very reason that EPA found it necessary to amend 40 C.F.R. § 51.166 to define the theretofore-undefined phrase "subject to regulation," while at the same time establishing new GHG definitions and emission thresholds in an intricate series of new regulatory provisions comprising five distinct subparagraphs (subdivided into six separate clauses) occupying 11 column-inches in the *Federal Register*. *See id.* at 31,606.

by "reasonable notice and public hearing," neither EPA nor any state could "interpret" a federally-enforceable SIP PSD program to require the program's expansion to include a pollutant like GHGs where that expansion would transform the PSD program into something fundamentally different from the one adopted by the state and approved by EPA.

In sum, because there was not (and could not have been) any requirement that, to be "approvable," the Texas SIP in 1992 had to include general provisions that would allow Texas in the future to expand the PSD program—without following the SIP revision process—to cover potentially thousands of GHGs sources to which that program historically did not (and could not) apply, EPA's approval of that SIP at that time could not have been "in error." Thus, the predicate for EPA's invocation of CAA § 110(k)(6)—to correct, years after the fact, an "error" that EPA now asserts it made—simply does not exist.

**2. CAA § 110(k)(6) Is An Error Correction Provision Of Limited Scope And Effect That Does Not Authorize EPA Action To Effect New Policy Judgments**

The CAA Amendments of 1990 made a number of modifications to CAA § 110, reorganizing certain of its provisions; enlarging some of the timeframes for state

25

and EPA action; adding a new subsection (k) that, among other things, explicitly provides for the "SIP call" procedure for which the Act implicitly provided before those Amendments;[6] and otherwise making conforming changes to reflect these revisions and the section's reorganization.[7]  Paragraph (k)(6) was enacted as part of the 1990 Amendments' general reorganization of § 110.

Entitled "Corrections," paragraph (k)(6) provides that "[w]henever the Administrator determines that the Administrator's action approving, disapproving, or promulgating any plan or plan revision (or part thereof), area designation, redesignation, classification, or reclassification was in error," the Administrator "may

---

[6] Paragraph (k)(5) of Clean Air Act § 110, added as part of the 1990 Amendments' general reorganization of Clean Air Act § 110, provides that "[w]henever the Administrator finds that the applicable implementation plan for any area is substantially inadequate," the Administrator "shall require the State to revise the plan as necessary to correct such inadequacies."  This language parallels that in Clean Air Act § 110(a)(2)(H)(ii), as it read before the 1990 Amendments (*i.e.*, requiring the Administrator to approve a SIP if she finds that, among other things, the SIP "provides for revision, after public hearing, of such plan ... (ii) ... whenever the Administrator finds ... that the plan is substantially inadequate.").  42 U.S.C. § 7410(a)(2)(H)(ii) (1988).

[7] *See, e.g.*, *Virginia v. EPA*, 108 F.3d 1397, 1406 (D.C. Cir. 1997) ("Enacted more than a quarter of a century ago, section 110 has gone through many changes, but its basic structure has survived."), *modified on other grounds*, 116 F.3d 499 (D.C. Cir. 1997); *see also Natural Res. Def. Council v. Browner*, 57 F.3d 1122, 1123 (D.C. Cir. 1995) ("*NRDC v. Browner*")("In 1990, Congress amended the Act to revise the timing and content of the SIP requirements.").

in the same manner as the approval, disapproval, or promulgation revise such action as appropriate without requiring any further submission from the State." 42 U.S.C. § 7410(k)(6). The provision states that "[s]uch determination and the basis thereof shall be provided to the State and public." *Id.*

Paragraph (k)(6) did not give EPA new authority but instead affirmed and clarified EPA's inherent authority to make corrections. Shortly before the 1990 Amendments' enactment, *Concerned Citizens of Bridesburg v. EPA*, 836 F.2d 777 (3d Cir. 1987), addressed the scope of EPA's "correction" authority. Thus, as EPA observes, the "timing of the enactment" of § 110(k)(6) occurred "against the backdrop of the *Bridesburg* case." [8] 76 Fed. Reg. at 25,180/2-3.

In *Bridesburg*, citizens groups challenged EPA's removal from the Pennsylvania SIP of certain state and local odor control regulations that the Agency had approved as part of that SIP 13 years earlier. The groups had sued in federal district court under CAA § 304(a), seeking to enforce the odor regulations. While that suit was pending, EPA rescinded those regulations. EPA explained that its previous approval

---

[8] *See also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 379 (1982) (observing that legislators may be "assumed [to be] familiar with the judicial decisions construing" statutory language undergoing revision (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 696-97 (1979)).

of the regulations as part of the SIP had been "inadvertent," that it had lacked authority under the CAA to have "include[d] odor regulations in a SIP" to begin with,[9] and that its subsequent removal of those SIP provisions was "merely a correction of [that] EPA error made thirteen years before." 836 F.2d at 779-780.

The Third Circuit accepted the citizen groups' argument that EPA had acted improperly by not treating the change as a SIP revision under § 110. *Id.* at 784. "[A]ll parties agree," the court observed, that if "EPA has effected a 'revision' in the Pennsylvania SIP … within the meaning of" CAA §§ 110(a)(2) and (c)(1), then EPA had "done so improperly, for it should have proposed the revision to the state for the state to conduct a hearing." *Id.* In finding that EPA had acted improperly, the Third Circuit explained the CAA "does not provide any authority" to EPA for "modifying an existing SIP other than through the revision provisions." *Id.* at 785. "Faced with

---

[9] EPA lacked authority under the Clean Air Act to include odor control regulations in a SIP, EPA correctly argued, because such regulations "bore 'no relation to attainment or maintenance'" of any NAAQS. *Bridesburg*, 836 F.2d at 782 (internal citation omitted). Under Clean Air Act § 110(d), as it read at the time *Bridesburg* was decided and before the 1990 Amendments, an "applicable implementation plan" was defined as "the … plan … which has been approved under subsection (a) [of § 110] … *and which* implements the *requirements of this section.*" 42 U.S.C. § 7410(d) (1988) (emphasis added). At the time of the *Bridesburg* decision, EPA's position was that the odor control regulations did not "implement[]" any "requirement[]" of Clean Air Act § 110.

this problem," the court noted, EPA had sought to characterize the change as being merely "corrections" to the SIP and EPA's "original [SIP] approvals as 'inadvertent.'" *Id.* at 785-786.

The *Bridesburg* court was unpersuaded, observing that EPA had "approved [the odor] provisions some thirteen years ago," and then "twice approved modifications of the odor provisions without suggesting that odor regulations as a whole are unauthorized." *Id.* at 786. While implicitly acknowledging EPA's claim that it possessed "correction" authority, the court rejected EPA's suggestion that its prior (and repeated) approvals had in fact been "inadvertent." EPA could credibly advance an "inadvertence" claim, the court said, only if EPA's "policy at these times" had been that "odor regulations do not contribute to attainment of the NAAQS" and that EPA "would not approve them." *Id.* But the "record reveals that no such EPA policy existed" at the time of SIP approval. *Id.*

It is evident that, in adding paragraph (k)(6) to § 110 in 1990, Congress did no more than clarify that EPA did possess the limited "error correction" authority the Third Circuit in *Bridesburg* assumed EPA had under CAA § 110's allocation of authority. The legislative history confirms this, explaining that paragraph (k)(6) "explicitly authorizes EPA on its own motion … to correct any errors it may make in taking any action, such as issuing any designation or classification, or approving or disapproving any plan." H. Rep. No. 101-490, Pt. 1, at 220 (1990), *reprinted in* 2 Leg. Hist. at 3244. The reference to "*explicit[]* authori[ty]" under paragraph (k)(6) to

"correct … errors" reveals congressional recognition that, before the provision's enactment, EPA already had *implicit* authority to "correct" errors of the sort addressed by the new provision.

Subsequent to enactment of CAA § 110(k)(6), Representative Waxman, who chaired a key subcommittee that considered the 1990 Amendments and who has advocated *for broad federal authority* under the Act, described paragraph (k)(6) in terms that confirm that EPA's authority to alter state plans under that provision is narrowly circumscribed.  Using language that mirrors the legislative history, Congressman Waxman explained his view that paragraph (k)(6) "explicitly authorizes EPA on its own motion to correct any errors it may make in taking any action, such as issuing any designation or classification, or approving or disapproving any plan."  Waxman, *supra*, at 1924-1925.[10]  Of critical importance, even Congressman Waxman understood that CAA § 110(k)(6) was "*not intended to offer a route for EPA to reevaluate its policy judgments*," but was "included to enable EPA to deal promptly" with situations in which "*clerical*" or "*technical*" corrections were needed.  *Id.* (emphases added).

---

[10] This Court has cited Representative Waxman's analysis of the legislation when it has interpreted provisions enacted or revised in the 1990 Amendments.  *See, e.g.*, *S. Coast Air Quality Mgmt. Dist.*, 472 F.3d at 886; *Natural Res. Def. Council, Inc. v. Reilly*, 983 F.2d 259, 272 n.22 (D.C. Cir. 1993).

At issue here are not clerical or technical corrections but a reversal of a policy judgment made years ago. Section 110(k)(6) provides *no* authority to effect new policy judgments. EPA's reliance on that provision here is unlawful.

### 3. EPA's Resort To CAA § 110(k)(6) To Change Its Prior Considered Decision On The Texas SIP Is Unlawful

In promulgating the final rule, EPA contended that, because CAA § 110(k)(6) "nowhere … define[s] what qualifies as 'error,'" the term "should be given its plain language, everyday meaning, which includes all unintentional, incorrect *or wrong* actions or mistakes." 76 Fed. Reg. at 25,180 (emphasis added). The magnitude of EPA's claim is extraordinary. EPA construes paragraph (k)(6) as authorizing it to revisit and reverse any past EPA action on a SIP submittal, no matter how long ago it was taken, and without regard to the fact that EPA believed its decision was correct at the time.

As explained below, EPA's interpretation of § 110(k)(6) contradicts Congress' unambiguously expressed intent and thus fails as a matter of *Chevron* step one. *See, e.g.*, *NRDC v. Browner*, 57 F.3d at 1125 (under the "framework set forth in *Chevron*," the court "must first exhaust the traditional tools of statutory construction to determine whether Congress has spoken to the precise question at issue.")(internal quotation marks omitted). EPA's reading of § 110(k)(6) is fundamentally inconsistent with the CAA's basic structure as it pertains to EPA's review, approval, and disapproval of

SIPs. That structure, and the congressional intent that it reveals, must guide construction of the text of paragraph (k)(6).

### a.    EPA's Reading Of CAA § 110(k)(6) Is Contrary To The Structure Of CAA § 110

EPA's reliance on CAA § 110(k)(6) to transform EPA's full approval of Texas' decades-old SIP submission into a disapproval constitutes an assertion of revisionist power that contradicts the Act. EPA attempted here to circumvent the CAA's procedural requirements and protections for states with EPA-approved SIPs, thereby defeating Congress' intent in crafting a SIP revision process that respects states' role in implementing air-quality policy. The interpretation of § 110(k)(6) on which EPA relied here essentially gives it unlimited discretion to revisit and reverse earlier approvals of SIP submissions without the new public hearings and new state submittals that Congress required and intended. Such an approach is incompatible with CAA § 110's highly-circumscribed process for SIP submission, approval, and subsequent revisions.

Under CAA § 110(k)(1)(B), EPA is allowed a maximum of six months after it receives a SIP revision to determine whether the minimum criteria for SIP completeness have been satisfied. Beginning on the date it determines the SIP submission is complete (or, if earlier, the date that is six months after it receives the submission), EPA has 12 months to approve or disapprove the submission. 42 U.S.C. § 7410(k)(2). In making this determination, EPA has *no discretion* to disapprove a plan

that meets the CAA's minimum requirements, even if EPA disagrees with the state's choices reflected in the plan.  42 U.S.C. § 7410(k)(3); *see Train v. Natural Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975).

To interpret § 110(k)(6) as allowing EPA to substitute *disapproval* of a SIP submission for EPA's *approval* of that same submission, and to do so years after EPA received the submission, would circumvent Congress' command that EPA make a binding decision to approve or disapprove a SIP within not more than 18 months.  *See also Bridesburg*, 836 F.2d at 786 (holding that an action revising a SIP outside of the statutory period was not an error-correction action).  As discussed herein, § 110's text and structure establish that, in exercising its powers under § 110(k)(6), EPA may only correct clerical errors or clarify prior actions.  The contrary, expansive construction of this power for which EPA now argues contradicts § 110's comprehensive scheme governing initiation of SIP revisions and EPA action on those revisions.

Section 110(k)(5) allows for EPA to "call" for revisions to SIPs that have become "substantially inadequate … to … comply with any requirement of" the CAA.  Consistent with the Act's default SIP process, EPA's § 110(k)(5) authority is expressly limited.  First, EPA must find that the inadequacy in the SIP is "substantial[]."  Second, EPA may only "subject the State to the requirements of [the CAA] to which the State was subject when it developed and submitted the plan for which such finding was made, except that the Administrator may adjust any dates applicable under such requirements as appropriate."  42 U.S.C. § 7410(k)(5).  EPA's

33

call for SIP revisions may not, therefore, require a state to follow any regulatory requirements that did not apply when the state submitted its SIP for EPA's approval. New requirements must undergo § 110(a)'s SIP adoption and submittal process.

If the interpretation of § 110(k)(6) on which EPA relied here were correct, it would render § 110(k)(5) superfluous. Statutes must be construed so as not to render terms mere surplusage. *See, e.g.*, *Duncan v. Walker*, 533 U.S. 167, 174 (2001). Rather than issue a SIP call under § 110(k)(5), EPA would simply be able to declare any earlier SIP approval "in error" and simultaneously disapprove the SIP, without finding it "substantially inadequate," without providing the state any opportunity to cure the inadequacy, and without any public hearings at the state level. Congress would not have simultaneously both (i) required procedural protections for states with "substantially inadequate" SIPs, and for those states' citizens, and (ii) authorized EPA to evade those procedural requirements by unilaterally transforming approval into disapproval on the grounds that the "approval" of a substantially inadequate SIP was "error." Congress cannot be thought to have enacted a paragraph (k)(5) requiring findings and procedures, and then render that provision unnecessary by enacting the immediately following subparagraph. Yet that is the position EPA asks this Court to endorse by affirming its actions here. That position is contrary to the statute and must be rejected.

### b.    EPA's Reading Of CAA § 110(k)(6) Contravenes Its Plain Text

As Texas explained at length in its comments on EPA's proposed rule, the interpretation of CAA § 110(k)(6) on which the Agency relied in support of its action here also contravenes the provision's text.[11]  Paragraph (k)(6) contains four express limitations on EPA's authority.  First, the action EPA is "correcting" must have been "in error."  Second, EPA must act "in the same manner" as it did in its prior action.  Third, EPA may only "revise"—not rescind or revoke or reverse—"such action" as it previously undertook.  Finally, EPA may act only "as appropriate."

Applying traditional canons of statutory construction, which, *inter alia*, call for the structural analysis discussed above, these textual features of CAA § 110(k)(6) underscore that "Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842.  CAA § 110(k)(6) provides no authority to reverse a SIP action based on policy changes occurring years after EPA approval.

### i.    EPA Misconstrued "Was In Error"

EPA argued that, because the "term 'error' in CAA section 110(k)(6) is not defined," it should be given its "ordinary, everyday meaning," and cited various

---

[11] *See* EPA-HQ-OAR-2010-1033-0232 at 42-51 (Comments of Petitioner Texas), J.A. __-__.

dictionary definitions for the proposition that this "ordinary" meaning is a "broad" one.  76 Fed. Reg. at 25,198, J.A. __.  But paragraph (k)(6) authorizes EPA to act only where its past action "*was* in error," not where that action "*is* in error."  Congress' use of the past tense limits EPA's authority under paragraph (k)(6) to correcting actions that were erroneous at the time they were made, not to correcting actions that *years later* allegedly became deficient due to new regulatory requirements or agency interpretations.

The purported "error" at issue here—approval of a SIP submittal that indisputably was determined by EPA to be approvable at the time it was submitted—cannot be "error" within the meaning of § 110(k)(6).  If it were, then EPA could give "error" so broad a meaning as to authorize any unilateral change in a SIP whenever EPA changed policy, depriving the statutory phrase "was in error" of any limiting effect and negating Congress' comprehensive scheme in CAA § 110(a), (c), and (k)(5) for SIP promulgation and revision.  This result, in turn, would violate the "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative."  *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 510 n.22 (1986) (quoting *Colautti v. Franklin*, 439 U.S. 379, 392 (1979)).

## ii.    EPA Misconstrued "In the Same Manner"

EPA may act under § 110(k)(6) only "in the same manner" as it did in promulgating its original SIP approval.  This phrase reinforces the interpretation of

"error" as precluding use of paragraph (k)(6) to revisit past SIP approvals through application of new criteria.

Courts have consistently interpreted the term "in the same manner" to incorporate substantive, in addition to procedural, requirements. *See, e.g.*, *United States v. Navistar Int'l Transp. Corp.*, 152 F.3d 702, 714 (7th Cir. 1998); *United States v. Township of Brighton*, 153 F.3d 307, 324 (6th Cir. 1998). Accordingly, when a SIP is subject to EPA's error-correction power—*e.g.*, because of an error in the SIP's supporting technical documentation—EPA must subject the corrected SIP to the same standards that governed original approval of the SIP.

Subsection (k)(6) further contemplates that EPA will *act* "in the same manner" that it did previously—*i.e.*, will take the same kind of action. If EPA is unable to act "in the same manner"—because the deficiency is substantive in nature and renders a past SIP submission inadequate—then EPA may not invoke paragraph (k)(6) but must instead call for SIP revision under paragraph (k)(5).

Here, EPA failed to act "in the same manner," both procedurally and substantively. EPA applied different standards to Texas' SIP today than those that were in place in 1992, and it made its decision on a different record than the one supporting its 1992 action. Any EPA action to correct an "approval" must result in a corrected "approval," not in a "disapproval."

### iii.  EPA Ignored The Significance Of "Revise Such Action"

Paragraph (k)(6) affords EPA no discretion to "revise" an approval by turning it into a disapproval but instead limits the Agency to revising the contents of "such action" that it previously undertook.  In this regard, the phrase "such action" is not an empty semantic vessel but as a matter of grammar refers back to the only "action" mentioned previously in the provision: "the Administrator's action approving, disapproving, or promulgating any plan or plan revision (or part thereof), area designation, redesignation, classification, or reclassification."

To "revise" is to "go or read over to correct errors or make improvements." *Webster's Third New International Dictionary* at 1944 (1971).  EPA does not "revise" an action that involves "approval" of a SIP by taking the polar opposite action: *i.e.*, "disapproval" of the SIP.  Rather, EPA must take the same *type* of action, a reading that is reinforced by the requirement that EPA act "in the same manner as the [original action]."  EPA may not, under paragraph (k)(6), evaluate a prior SIP approval, rescind that approval, and replace it with a disapproval.

In other words, § 110(k)(6) authorizes not revisiting an action but correcting minor mistakes in an action.  For example, where EPA may have approved a SIP that contained a typographical error—*e.g.*, inadvertent use of the wrong metric in describing an emission limit—EPA may under § 110(k)(6) "revise" its prior approval by correcting that error.  And it may do this without further submission from the

state, because in such circumstances taking such error-correcting action does not contradict the CAA's principle of state primacy.

By contrast, here EPA used CAA § 110(k)(6) to change the nature of its decision by substituting a SIP disapproval for a long-ago SIP approval. This was not authorized by paragraph (k)(6).

### iv.    EPA Ignored "As Appropriate"

EPA may act under CAA § 110(k)(6) only "as appropriate." As does § 110(k)(5)'s "as necessary" language, this language serves to "keep EPA within bounds." *Virginia*, 108 F.3d at 1410. EPA acts "appropriate[ly]" in revising an earlier action under § 110(k)(6) only where it corrects an error that was committed in undertaking that earlier action, not where it seeks to effect a policy change.

## B.    EPA Has No Inherent Authority To Disapprove Retroactively Texas' Decades-Old PSD SIP Submission

EPA's alternative basis for its decisions, that it has inherent authority to disapprove retroactively Texas' decades-old PSD SIP submission, is fatally flawed. *See* 75 Fed. Reg. at 82,436/1, J.A. __; 76 Fed. Reg. at 25,200/1, J.A. __. EPA's decision is directly contrary to precedent from a sister court of appeals, which holds that EPA has no inherent authority to revise SIPs. *See Bridesburg*, 836 F.2d 777. And as described above, CAA § 110 establishes a comprehensive scheme for SIP submissions, approvals, and revisions. As such, the CAA displaces any inherent authority EPA might otherwise have had in this area.

"An agency cannot … exercise its inherent authority in a manner that is contrary to a statute … [and] in situations where a statute does expressly provide for reconsideration of decisions, the agency is obligated to follow the procedures for reconsideration set forth in the statute." *Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1361 (Fed. Cir. 2008) (citation omitted).  The Third Circuit held that the CAA was just such a statute in *Bridesburg*, 836 F.2d at 787.  There, the court rejected EPA's attempt to assert inherent "authority to correct an inadvertent mistake" relating to the content of an approved SIP.  The *Bridesburg* court held that because CAA § 110 limits the time by which EPA must approve or disapprove a SIP, the statute also places "at least reasonable limits on the Administrator's authority to reconsider [a SIP action]." *Id.* at 786.  Accordingly, the court held that "[a] change after thirteen years is a fortiori a revision" that must be accomplished through appropriate statutory means. *Id.*[12]

The Third Circuit's decision unquestionably is correct in light of the Act's detailed procedural scheme for the adoption, submission, approval or disapproval,

---

[12] Similarly, this Court held in *New Jersey v. EPA*, 517 F.3d 574, 583 (D.C. Cir. 2008), that EPA lacked inherent authority to reconsider its decisions under the Clean Air Act where "Congress has provided a mechanism capable of rectifying mistaken actions." The Clean Air Act § 110 SIP revision process and the Clean Air Act § 110(k)(5) SIP Call procedure are just such mechanisms.

and revision of SIPs. *See* 42 U.S.C. § 7410(a), 7410(k); *see also supra* at 25-34. "In sum, the Clean Air Act is a comprehensive statute that attempts to enumerate all of the EPA's powers concerning SIPs," displacing any inherent authority EPA might otherwise have to disapprove Texas' submission outside the four corners of CAA § 110. *Bridesburg*, 836 F.2d at 787.[13]   EPA's actions here to the contrary were unlawful, and this Court should vacate them.

## C.   The EPA Actions Under Review Are Erroneous Because Texas' SIP Submission Met All Relevant CAA Requirements

EPA's retroactive disapproval of Texas' decades-old PSD SIP submission was not only unlawful, it was simply incorrect—Texas' PSD SIP submission was not, in fact, deficient.   EPA correctly determined in 1992 that the submission met all the relevant criteria established by the CAA and its regulations.   Far from erroneous, EPA's decision approving Texas' SIP was legally required.   *See* 42 U.S.C. § 7410(k)(3).

EPA based the here-challenged actions on two purported deficiencies in Texas' previously-approved PSD SIP submission:   Texas' alleged failure to "address the application of PSD to pollutants newly subject to regulation, including non-NAAQS

---

[13]   Any inherent authority EPA may have had at the time of *Bridesburg* was unambiguously extinguished by the enactment of Clean Air Act § 110(k)(6)'s limited error-correction provision in 1990.

41

pollutants," and Texas' alleged failure to "provide assurances that the state had adequate legal authority to apply PSD to such pollutants." 75 Fed. Reg. at 82,449/1-82,450/1, J.A. __; *see also* 76 Fed. Reg. at 25,198/2, J.A. __. But EPA's attempts to link these purported deficiencies to actual CAA and regulatory requirements are unavailing.

First, EPA attempts to tie these purported historic deficiencies to CAA §§ 110(a)(2)(J) and 161, which provide, respectively, that SIPs must "meet the applicable requirements of … part C" of Title I of the Act, 42 U.S.C. § 7410(a)(2)(J), and that SIPs "shall contain emission limitations and such other measures as may be necessary, *as determined under regulations promulgated under this part*, to prevent significant deterioration of air quality in each region" to which PSD applies. 42 U.S.C. § 7471 (emphasis added). *See* 76 Fed. Reg. at 25,198, J.A. __. But EPA never identified what PSD SIP "requirements" or "regulations," in place at the time Texas made and EPA approved its submittal, were violated. The reason EPA chose not to do so is apparent from the face of its Part 51 regulations: they require in relevant part only that SIP submissions demonstrate "authority" to "[p]revent construction, modification, or operation of a facility … which directly or indirectly results or may result in emissions of any air pollutant at any location *which will prevent the attainment or maintenance of a national standard.*" 40 C.F.R. § 51.230(d) (emphasis added). The regulations do not require legal authority for applying the PSD program to pollutants, like GHGs, for which EPA has not promulgated a national standard that may be attained or

42

maintained. EPA may not disregard its regulations and require enhanced legal authority requirements retroactively for Texas' decades-old PSD SIP submission.

Second, EPA attempts to tie these purported deficiencies to CAA § 110(a)(2)(E)(i), which requires that SIPs "provide … necessary assurances that the State … will have adequate personnel, funding, and authority under State … law to carry out *such implementation plan*." *See, e.g.*, 76 Fed. Reg. at 25,179/1 (emphasis added). But EPA's real complaint is that Texas' plan somehow did not "do enough" to provide for *changing* its plan to accommodate the inclusion of new regulatory developments apart from the procedurally regular SIP revision process, not that Texas lacked assurances for *implementing* the plan itself. EPA's reading is, thus, contrary to this section's plain language.

Moreover, EPA's interpretation is nonsensical. Besides stating that "automatic updating" is not required, *see* 76 Fed. Reg. at 25,198/1, J.A. __, EPA made no attempt to specify what assurances it believes states were required to provide in their SIP submissions. Nor did EPA explain how a state could possibly provide assurances that, for example, its legislature will revise state laws to EPA's liking within a certain period of time. Such assurances would be impossible for many states' political bodies to make.

Beyond the statutory problems with EPA's argument, EPA's claim that it did not know the process by which Texas would revise its plan to include new pollutants is belied by the administrative record. Texas has in the past used the CAA § 110 SIP

43

revision process, including the state-level administrative processes of CAA § 110(a) and the submission procedures now contained in CAA § 110(k), to include new pollutants in its PSD program, and EPA was aware that the process could take well over a year even where there was no dispute between EPA and Texas about the necessity of the revision. *See* 52 Fed. Reg. 24,634/1 (July 1, 1987); 57 Fed. Reg. 28,093 (June 24, 1992).

EPA's suggestion that Texas' PSD SIP submission was insufficient because the State's recent communications with EPA evidence a lack of appropriate assurances to implement the PSD program for non-NAAQS pollutants is similarly specious. *See, e.g.*, 75 Fed. Reg. at 82,458, J.A. ___, 76 Fed. Reg. at 25,196-25,197, J.A. ___. Texas' communications were made during ongoing litigation where the petitioners made this argument; on the regulatory side, Texas' PSD SIP has always included the ability to apply controls to non-NAAQS pollutants and Texas-issued PSD permits include all appropriate limits for those substances. Thus, Texas' statements have nothing to do with a PSD SIP submission that Texas made over 20 years earlier.

Therefore, even assuming *arguendo* that EPA has statutory authority to disapprove retroactively Texas' decades-old PSD SIP submission, the Agency's actions were arbitrary and capricious and should be vacated.

44

**D.    In Promulgating Its Interim Final Rule, EPA Unlawfully Disregarded Notice-And-Comment Rulemaking Requirements Despite Knowing Of The Purported Deficiency In Texas' PSD SIP Submission For Over 20 Years**

Despite knowing about the purported deficiencies in Texas' PSD SIP submission for over 20 years, EPA hid its plan to disapprove retroactively that submission until it rushed out an "interim" rule the very last day the *Federal Register* was published in 2010. The Court should not countenance EPA's decision to cut stakeholders out of the administrative process based on EPA's flimsy claims that doing so was in the public interest.

The APA and CAA § 307(d) require EPA to undertake notice-and-comment rulemaking before, respectively, taking final action approving or disapproving a SIP submission or imposing a FIP. *See* 5 U.S.C. § 553; 42 U.S.C. § 7607(d). The notice-and-comment rulemaking process is not a mere formality, but is "one of Congress's most effective and enduring solutions to the central dilemma [of] reconciling the agencies' need to perform effectively with the necessity that 'the law must provide that the governors shall be governed and the regulators shall be regulated, if our present form of government is to endure.'" *Am. Bus Ass'n v. United States*, 627 F.2d 525, 528 (D.C. Cir. 1980) (quoting S. Doc. No. 248, 79th Cong., 2d Sess. 244 (1946)). Moreover, "in the implementation of the Clean Air Act, where the heaviest responsibilities rest upon state governments and where federalism concerns are implicated, the usefulness and desirability of the APA's notice-and-comment

45

provision may be magnified." *New Jersey v. EPA*, 626 F.2d 1038, 1047 (D.C. Cir. 1980). Thus, "the various exceptions to the notice-and-comment provisions of [the APA] will be narrowly construed and only reluctantly countenanced," *id.* at 1045 (citing cases), and this Court has indicated that it "owe[s] EPA's findings no particular deference." *Mack Trucks, Inc. v. EPA*, No. 12-1077, slip op. at 10 (D.C. Cir. June 12, 2012).

EPA's two grounds for acting without notice and comment were that public participation "would be contrary to the public interest" because "no major stationary source emitting GHG at or above the levels set in the Tailoring Rule will be able to construct or modify," and that notice and comment was "impracticable" because it had "insufficient time to seek public comment before acting." 75 Fed. Reg. at 82,458, J.A. __. Both claims ignore the elephant in the room—that EPA had actually known the process for revising Texas' SIP to incorporate new pollutants for over 20 years. Its claims to the contrary are simply not consistent with the administrative record.

As described above, Texas revised its PSD SIP submission to include a newly-regulated pollutant, $PM_{10}$, through the SIP submission and approval process. *See supra* at 10-11. This was how EPA intended states with SIP-approved PSD programs to act. *See supra* at 11. It was also consistent with EPA's current actions vis-à-vis the Avenal facility, which are inconsistent with this action and the GHG SIP Call. *See id.* EPA may claim like Captain Renault that it is "shocked—shocked—to find out that

46

gambling is going on in here," but that is no excuse for disregarding procedural regularities when Texas insisted on being afforded its statutory procedural rights.

Even if the Court credits EPA's self-serving view of its original approval of Texas' SIP, EPA had five months to seek notice and comment on the Partial SIP Disapproval and FIP from the August 2, 2010 letter that EPA claimed "provides the … clearest articulation" of Texas' legal position. 75 Fed. Reg. at 82,447. In fact, EPA apparently knew that it would be disapproving retroactively Texas' PSD SIP submission no later than November 16, 2010—*six weeks before the Interim Final Rule*—when EPA made a formal submission to OMB explaining that it is "planning additional actions to ensure that GHG sources in Texas can be issued permits as of January 2, 2011." EPA-HQ-OAR-2010-0107-0127, J.A. __. Given that this statement was made in the context of a completed rule submission, EPA undoubtedly decided to act far earlier.

Instead of exposing its plans to public scrutiny, Assistant Administrator McCarthy represented to this Court only weeks earlier that a "FIP cannot be promulgated until December 2, 2011 at the earliest" for Texas. Att. 1 to McCarthy Decl., J.A. __. Then, EPA kept silent until the last day the *Federal Register* was published in 2010, when it published its interim final rule to disapprove retroactively Texas' decades-old PSD SIP submission.

"If the admonition to construe the good-cause exception of section 553(b)(B) narrowly means anything, it means that we cannot condone its invocation where"

47

reconciliation of EPA's action and the statute is possible. *New Jersey v. EPA*, 626 F.2d at 1047. Under these circumstances, EPA could have conducted a notice-and-comment rulemaking during this period, and in fact could have provided a comment period consistent with the comment period it provided in the rulemaking that resulted in the Final Rule. *See* 75 Fed. Reg. at 82,366; *see also Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984) (approving the view of the Administrative Conference of the United States "that the shortest period in which parties can meaningfully review a proposed rule and file informed responses is thirty days"). EPA's failure to do so was not justified, much less necessary to protect the public interest, but instead unquestionably an "emergency" of EPA's own making that is not good cause for disregarding the APA's and the CAA's procedural requirements. *See, e.g., Envtl. Def. Fund, Inc. v. EPA*, 716 F.2d 915, 921 (D.C. Cir. 1983) (good cause exception is inapplicable "when an alleged 'emergency' arises as the result of an agency's own delay").

Furthermore, EPA's public interest justifications that without the Interim Final Rule "sources would be subject to delays in construction or modification, causing economic harm to those sources and to others secondarily affected" and that the Interim Final Rule "serve[d] the necessary function of ensuring that a permitting

authority is available to issue permits for these sources, and thus that large sources in Texas do not face a *long delay* in their ability to construct or modify" are unsupported factually and legally.[14]   First, as a matter of fact and discussed above, EPA had more than enough time to pursue notice-and-comment before January 2, 2011.   Even assuming *arguendo* that it did not, notice-and-comment could have been accomplished in as little as 30 days and would not have resulted in the long delay EPA claimed would occur without the Interim Final Rule.   *See Petry*, 737 F.2d at 1201.   Second, circumventing public notice-and-comment left the record devoid of any factual support for EPA's speculations as to the timing of any potential projects or economic impacts.   In fact, the record actually contradicts EPA's speculation because "EPA . . . did not issue any PSD permits in Texas pursuant to the Interim Final FIP."   Respondent EPA's Motion to Dismiss at 13.   Third, as matter of law, EPA's last minute action is founded in its claim that large sources would not be able to rely on a PSD permit issued by Texas.   But, as discussed below,  EPA's claim presupposes a result that must be considered in the context of individual PSD permits.

_____

[14] 75 Fed. Reg. at 82,458 (emphasis added), J.A. __.

**E.    Petitioners' Challenges To The Interim Final Rule Are Not Moot Because They Present A Live Controversy**

Petitioners' challenges to EPA's Interim Final Rule are not moot. EPA, through the Interim Final Rule, divested Texas of the authority to issue "complete" PSD permits for a four-month period that was not covered by the Final Rule. During that period, the TCEQ issued several PSD preconstruction permits, including the permit to Petitioner Chase Power. If the Court vacates the Interim Final Rule, these permits would contain all emission limits authorized by law at the time of their issuance and sources could begin construction under their terms. Moreover, the Petitioners' challenges to the Interim Final Rule are not moot because EPA's action is of the kind capable of repetition yet evading review. Texas and other states generally cannot promulgate automatically-updating SIPs, and this issue likely will recur any time that EPA promulgates new CAA requirements or reinterprets the Act. The Court should, therefore, decide the Petitioners' live challenges to the Interim Final Rule.

**1.    Petitioners Continue To Suffer Ongoing Harm As A Direct Consequence Of EPA's Interim Final Rule**

A case only becomes moot "if interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *De Jesus Ramirez v. Reich*, 156 F.3d 1273, 1277 n.2 (D.C. Cir. 1998) (internal quotation marks omitted). Accordingly, "the burden of demonstrating mootness is a heavy one." *Coal. of Airline Pilots Ass'ns v. FAA*, 370 F.3d 1184, 1189 (D.C. Cir. 2004). Because the expiration of

50

the Interim Final Rule did not "completely and irrevocably eradicate[]" the effects caused by the Interim Final Rule, EPA cannot meet this heavy burden.

The Interim Final Rule harms Petitioner Chase Power and the other entities to which Texas issued PSD preconstruction permits during the Interim Final Rule's pendency.  *See* Decl. of Michael Wilson, J.A. __.  It was, after all, the Interim Final Rule, and not the Final Rule, that was in place on April 18, 2011, when Chase Power received from TCEQ the signed PSD permit for the LBEC.  The question of whether EPA had lawfully disapproved TCEQ's role as the sole permitting authority, and hence whether TCEQ could issue a complete PSD permit under its PSD SIP, makes this controversy live.  *See Sierra Club v. Jackson*, 648 F.3d 848, 853 (D.C. Cir. 2011) ("[W]e agree that the question of the validity of the PSD permits issued under the noncompliant SIP … raise[s] sufficient current controversy to save this litigation from mootness …").

Texas also has an ongoing interest in the legal enforceability of the PSD permits that it issued during the Interim Final Rule's pendency. Abrogating the validity of state-issued environmental permits upsets "principles that preserve the integrity of States in our federal system" and the finality of actions taken under state law.  *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 502, 513 (2004) (Kennedy, J., dissenting).  The result is "to confer on federal agencies ultimate decisionmaking authority, relegating States to the role of mere provinces or political corporations, instead of coequal sovereigns entitled to the same dignity and respect."

*Id.* at 518; *see also Alaska Dep't*, 540 U.S. at 491 (also recognizing states' interest); *New Motor Vehicle Bd.*, 434 U.S. at 1351 (Rehnquist J., in chambers) (when a state is prevented "from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").

EPA's arguments in favor of mootness are legally unfounded. First, EPA has claimed that the promulgation of a final rule to replace an interim rule during the pendency of a challenge to the interim rule always renders the case moot. *See* Respondent EPA's Motion to Dismiss for Mootness at 12. EPA's claim is false:

> [T]he provision of post-promulgation notice and comment procedures cannot cure the failure to provide such procedures prior to the promulgation of the rule at issue. In this case, the fact that EPA provided notice and comment procedures after the postponement does not cure the failure to provide them before the postponement.

*Natural Res. Def. Council, Inc. v. EPA*, 683 F.2d 752, 768 (3d Cir. 1982); *see also Am. Mar. Ass'n v. United States*, 766 F.2d 545, 554 n.14 (D.C. Cir. 1985) (holding that a challenge to the interim rule was not mooted even though "aspects of th[e] litigation could also be resolved in a petition to review the final rule"); *Union of Concerned Scientists v. Nuclear Regulatory Comm'n*, 711 F.2d 370, 377 (D.C. Cir. 1983) (concluding that a final rule did not moot a claim based on an interim rule prescribed without notice and comment, where the final rule built on the rationale in the interim rule); *Natural Res. Def. Council, Inc. v. Abraham*, 355 F.3d 179, 206, 206 n.14 (2d Cir. 2004) (same). To hold otherwise "would allow EPA to … [take] an action without

complying with the APA, and then establish[] a notice and comment procedure on the question of whether that action should be continued." *Natural Res. Def. Council*, 683 F.2d at 768.   And this, the court feared, would essentially "allow agencies to circumvent … the APA." *Id.*   Likewise, allowing EPA to make up for its lack of notice and comment in the Interim Final Rule with *post hoc* notice and comment on the Final Rule would effectively allow EPA to regulate without regard for the procedural requirements of the CAA and the APA.

Second, EPA has argued that the Interim Final Rule does not injure Texas or its citizens because any PSD permits that TCEQ issued during the Interim Final Rule's pendency would be held invalid because they would lack emission limitations for GHGs.  *See* Respondent EPA's Motion to Dismiss for Mootness at 16-18.  In fact, as noted above, EPA arbitrarily declared that the Interim Final Rule was in the public's interest to prevent a gap in PSD permitting authority.   However, EPA's claims regarding individual permits are the subject of administrative proceedings outside this Court's jurisdiction and the CAA requires any suit to enjoin construction of these permitted sources or to enforce against them to be brought in the district court.  *See* 42 U.S.C. §§ 7413(b), 7477.  EPA presses this claim in this Court, however, because precedent elsewhere is unfavorable.  EPA's position, for example, is directly contrary to the Seventh Circuit's decision in *United States v. Cinergy Corp.*, 623 F.3d 455, 458-459 (7th Cir. 2010), which holds that "the agency must live with" the content of an approved SIP and that the "Clean Air Act does not authorize the imposition of

sanctions for conduct that complies with a [SIP] that the EPA has approved." Moreover, EPA's own action in issuing the PSD permit for the Avenal facility after January 2, 2011 without GHG limits is inconsistent with its claim in this matter that the PSD permitting authority does not have discretion in the context of a particular PSD permit. *See supra* at 11. The Court should refuse EPA's attempt to have this controversy declared dead based on grounds that the CAA requires to be raised in the district court.[15]

In sum, Chase Power and Texas continue to suffer significant harm from EPA's Interim Final Rule. This Court can redress these injuries by finding EPA's Interim Final Rule invalid, thereby affirming Texas' authority to issue complete PSD permits in the period from January through April 2011, and, with it, Chase Power's permit. *Cf. Natural Res. Def. Council, Inc.*, 683 F.2d at 767 ("In this case, placing petitioner in the position it would have occupied had the APA been obeyed requires that this court order EPA to reinstate all of the amendments, effective March 30,

---

[15] Although the issue is not before the Court in this action, EPA's argument is also incorrect as a matter of law. *See* State Petitioners' Reply Brief, at 11-17, *UARG v. EPA*, No. 11-1037 (D.C. Cir.) (explaining that EPA's argument, if accepted, "precludes state plans from having any role in administering the [PSD] program" and is therefore inconsistent with numerous statutory provisions).

1981, and rule that the further postponement of the four amendments as of January 31, 1982, was ineffective.").

### 2.  Alternatively, Petitioners' Claims Satisfy The Exception To Mootness For Actions Capable Of Repetition Yet Evading Review

Petitioners' challenges to EPA's Interim Final Rule present a live controversy that this Court can resolve.  But even if the Court were to find that Petitioners' claims are now moot, the Court should reach the merits because EPA's interim rulemaking is an action "capable of repetition yet evading review."  *Honeywell Int'l., Inc. v. Nuclear Regulatory Comm'n*, 628 F.3d 568, 576-77 (D.C. Cir. 2010).  The issue of whether EPA may ignore the APA's and CAA's notice-and-comment requirements to displace an approved SIP is likely to recur, because Texas and other states cannot promulgate automatically-updating SIPs, but evades review because of the temporary nature of an interim final rule.

"[W]hen questions are likely to arise repeatedly, 'their consideration ought not to be … defeated[] by short term orders, capable of repetition, yet evading review.'" *Seatrain Int'l v. Fed. Mar. Comm'n*, 598 F.2d 289, 292 (D.C. Cir. 1979) (quoting *S. Pac. Terminal Co. v. ICC*, 219 U.S. 498 (1911)). This doctrine applies when "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Pharmachemie BV v. Barr Labs, Inc.*, 276 F.3d 627, 633 (D.C. Cir. 2002).

The Interim Final Rule was effective for too short a period to be litigated prior to its expiration. The Court has repeatedly recognized that, as a matter of law, "orders of less than two years' duration ordinarily evade review" for purposes of mootness analysis. *See, e.g., McBryde v. Comm. to Review Circuit Council Conduct and Disability*, 264 F.3d 52, 55-56 (D.C. Cir. 2001). And, because EPA's regular revision of PSD requirements presents ample opportunity for repetition, Texas may reasonably expect that EPA will in the future act on its SIP while evading notice-and-comment requirements because Texas may not, under its law, promulgate an automatically-updating SIP, *see Trimmier v. Carlton*, 296 S.W. 1070 (Tex. 1927), and because of the uncertainty as to what other or additional "assurances" it may provide to EPA to prevent the Agency from arrogating Texas' regulatory authority, *see supra* at 43-44.

As a result, under EPA's new position that PSD requirements are self-executing and that any delay in implementing them triggers a lapse in permitting authority that is "good cause" to evade notice-and-comment requirements, Texas will be ensnared by EPA's implementation of new PSD requirements in every instance. This Court has held that an agency's continuity of the policy underlying a challenged action, which may be evidenced by its defense of the action, renders it "more likely" that the action will recur. *See, e.g., Reeve Aleutian Airways, Inc. v. United States*, 889 F.2d 1139, 1143 (D.C. Cir. 1989) (no dismissal for mootness where suspension order, since reversed, established "clear policy" that might again be applied against plaintiff). *Accord Doe v. Harris*, 696 F.2d 109, 113 (D.C. Cir. 1982) ("When a complaint identifies

official conduct as wrongful and the legality of that conduct is vigorously asserted … , the complainant may justifiably project repetition"). Here, EPA has established a policy—disregarding notice-and-comment requirements where a SIP does not address newly-regulated pollutants—and now aggressively defends it by arguing that it is consistent with EPA's long-standing practice.

Accordingly, there is every reason to believe that EPA's wrongful conduct will recur, unless checked by judicial review.

## CONCLUSION

For the foregoing reasons, the Court should vacate the Interim Final Rule and Final Rule.

Dated: June 18, 2012

*/s/ John A. Riley (by permission)*
JOHN A. RILEY
CHRISTOPHER C. THIELE
Bracewell & Giuliani LLP
111 Congress Avenue, Suite 2300
Austin, Texas 78701-4061
Telephone: (512) 542-2108
Facsimile: (800) 404-3970
E-mail: john.riley@bgllp.com
*Counsel for Chase Power Development, LLC*

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

J. REED CLAY, JR.
Special Assistant and Senior Counsel to
the Attorney General

/s/ F. William Brownell (by permission)
F. WILLIAM BROWNELL
HENRY V. NICKEL
NORMAN W. FICHTHORN
ALLISON D. WOOD
Hunton & Williams LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037-1701
Telephone: (202) 955-1500
Facsimile: (202) 778-2201
E-mail: bbrownell@hunton.com
*Counsel for the Utility Air Regulatory Group*

/s/ David B. Rivkin, Jr.
DAVID B. RIVKIN, JR.
MARK W. DELAQUIL
ANDREW M. GROSSMAN
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5304
Telephone: (202) 861-1500
Facsimile: (202) 861-1783
E-mail: drivkin@bakerlaw.com
*Counsel to the State of Texas*

/s/ Shannon S. Broome (by permission)
CHARLES H. KNAUSS
SHANNON S. BROOME
Katten Muchin Rosenman LLP
2900 K Street, NW, North, Suite 200
Washington, DC  20007
Telephone: (202) 625-3500
Facsimile:  (202) 295-1125
E-mail: shannon.broome@kattenlaw.com
*Counsel for Petitioners SIP/FIP Advocacy
Group, Texas Association of Business, Texas
Association of Manufacturers and Texas
Chemical Council*

MATTHEW G. PAULSON
Baker Botts LLP
98 San Jacinto Boulevard
1500 San Jacinto Center
Austin, TX  78701
Telephone: (512) 322-2500
Facsimile: (512) 322-8329
E-mail:
matthew.paulson@bakerbotts.com
*Counsel for Petitioners SIP/FIP Advocacy
Group, Texas Association of Business, Texas
Association of Manufacturers and Texas
Chemical Council*

ROGER R. MARTELLA, JR.
Sidley Austin LLP
1501 K Street, NW
Washington, DC  20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711
E-mail: rmartella@sidley.com
*Counsel for Petitioners SIP/FIP Advocacy*
*Group, Texas Association of Business, Texas*
*Association of Manufacturers and Texas*
*Chemical Council*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure and Circuit Rules 32(a)(1) and 32(a)(2)(C), I hereby certify that the foregoing Petitioners' Brief contains 13,858 words, as counted by a word processing system that includes headings, footnotes, quotations, and citations in the count, and therefore is within the word limited set by the Court. I further certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Garamond font.

Dated: June 18, 2012                    /s/    Mark W. DeLaquil
                                        Mark W. DeLaquil

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Petitioners' Brief and Addendum was filed electronically with the Court by using the CM/ECF system on the 18th day of June 2012. Participants in the case who are registered CM/ECF users will be served through the CM/ECF system. Two (2) copies of the foregoing Petitioners' Brief and Addendum will also be served on all parties by U.S. mail, first-class, postage-prepaid.

/s/    *Mark W. DeLaquil*
Mark W. DeLaquil